CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

March 20, 2019

JULIA C. DUDLEY, CLERK
BY: K. Ayersman
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

MARC EDWARDS,         )

        )

    Plaintiff,       )    Case No. 7:18-cv-378

        )

v.        )

        )

PAUL SCHWARTZ, et al.,    )    By: Michael F. Urbanski

        )    Chief United States District Judge

    Defendants.    )

## MEMORANDUM OPINION

This matter is before the court on a motion to dismiss, ECF No. 13, plaintiff Marc Edwards' Amended Complaint, ECF No. 9, filed by defendants Paul Schwartz, Yanna Lambrinidou, and Melissa Mays (hereinafter, collectively, "defendants"), pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, for want of personal jurisdiction and failure to state a claim upon which relief can be granted, respectively. The defendants have also moved for attorney's fees pursuant to Va. Code Ann. § 8.01-223.2. This matter was removed from the Circuit Court for Montgomery County, Virginia, to the United States District Court for Western District of Virginia on August 1, 2018. This court exercises jurisdiction pursuant to 28 U.S.C. § 1332.[1] Edwards filed his Amended Complaint on August 24, 2018, alleging defamation per se (Count I), defamation (Count II), tortious interference with contract expectancy, business relationship, and economic advantage

---

[1] This case satisfies the subject matter jurisdiction requirements of 28 U.S.C. § 1332(a) as there is complete diversity of the parties and the amount in controversy exceeds $75,000. Edwards is a citizen of Virginia and the defendants are citizens of Washington, D.C. and Flint, Michigan. Edwards moves for a judgment against the defendants in the amount of $3,000,000 in compensatory damages, plus pre-judgment and post-judgment interest at the maximum rates allowed by law on the entire judgment from the date of May 10, 2018 until paid.

(Count III), common civil law conspiracy (Count IV), and statutory civil conspiracy pursuant to Va. Code Ann. § 18.2-499 (Count V), against all defendants. The court held a hearing on October 29, 2018, after which it ordered Edwards to file a supplemental brief (henceforth "Supplemental Memorandum") identifying which of the numerous statements set forth in the Amended Complaint allegedly give rise to causes of action under Count I and Count II. The court requested the Supplemental Memorandum include only those statements that fall within Virginia's statute of limitations period for defamation. Va. Code Ann. § 8.01-247.1 (West).[2] On November 9, 2018, Edwards filed this memorandum with the court. ECF No. 27. Schwartz and Mays filed a response on November 16, 2018, ECF No. 30, and Lambrinidou filed a separate response on November 21, 2018, ECF No. 31. Upon thorough examination of the voluminous submissions made by the parties and for the reasons set forth herein, the motion to dismiss for want of personal jurisdiction pursuant to Rule 12(b)(2) is **GRANTED in part** and **DENIED in part**, and the motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is **GRANTED** as to Counts I–V.

## I.

### A.

The controversy giving rise to this case relates to protracted personal, professional, and advocacy-related disputes concerning the water crisis in Flint, Michigan. Marc Edwards, a Virginia Polytechnic Institute and State University ("Virginia Tech") professor involved in exposing the contamination in Flint, Michigan, claims that prior to the events giving rise to

---

[2] The court also granted the defendants' motion to stay discovery, ECF No. 16, pending the disposition of this motion to dismiss. The court indicated at the time of the hearing that it would provide further guidance on discovery if the case were to go forward, and as the court has determined that the matter should not go forward, all discovery related issues are hereby rendered moot.

2

this case, he "enjoyed a distinguished reputation in the community at large and an unblemished professional reputation in the fields of education, science, and community advocacy." ECF No. 9, at 2–3. Edwards' causes of action in Counts I–V are predicated upon an allegedly defamatory letter ("Letter") published on May 10, 2018, "as well as numerous subsequent dates," and a multitude of other statements made via "Facebook posts, Twitter tweets, television interview, radio interviews, emails, correspondence, and other public fora." Id. at 5, 24. The statements alleged as defamatory or defamatory per se fall into two categories: (1) those contained in the Letter, and (2) and those contained in communications made via Facebook, Twitter, YouTube, and elsewhere. It is the Letter, however, that by Edwards' own characterization, is "at the heart of this case." ECF No. 21, at 4; see id. at 29 ("[T]he case arises from this Letter . . .").

Edwards asserts that the Letter marked the "crescendo" of a concerted and ongoing disparagement campaign conducted by the defendants against him that began in 2016. ECF No. 9, at 4. The Letter accuses Edwards of, among other things, speaking on behalf of Flint residents without their consent, engaging in "[u]nsubstantiated defamation of Flint residents," and obstructing "Flint's right for self-determination." ECF No. 9–1; ECF No. 27–1, at 2. In the course of this litigation, Edwards submitted three versions of the Letter for the court's review. Though each version of the Letter is substantively the same, the quantity and identities of the signatories differ. The first version of the Letter was submitted with the Amended Complaint as Exhibit 1, ECF No. 9–1, and featured the signatures of 39 Flint workers, parents, and residents, including Melissa Mays, as well as an Episcopal priest. It is this first version of the Letter that was apparently sent on May 10, 2018 as an email

3

attachment to, among others, Virginia Tech president Timothy Sands, the Union of

Concerned Scientists, the National Academy of Sciences, the Association of Environmental

and Engineering Science Professors, the American Association for the Advancement of

Science, the National Science Foundation, and several individuals within Edwards'

professional community or associated with the aforementioned organizations. ECF No. 9, at

6. The content of the email is as follows:

> Esteemed President Sands,
>
> Residents of Flint request you tell us where we can file a formal
> complaint against the behavior, since January 2016, of Professor
> Marc Edwards of Virginia Tech. We also request that you send
> representatives to Flint as soon as possible for a meeting with
> us to hear directly from us about our experiences with Mr.
> Edwards and our call for an investigation into Mr. Edwards'
> conduct and the harm his actions have caused.
>
> Attached is our full complaint. Thank you for your time and
> immediate attention on this matter.
>
> Affected Residents of Flint, Michigan

Id. The Letter itself is addressed "To the Scientific and Engineering Communities." Id. The

following "false and harmful" statements from the Letter were flagged by Edwards as

defamatory and/or defamatory per se and are excerpted and numbered below as they were

presented in paragraph 13 of the Amended Complaint.[3] Id. at 5. The bolded portions of

paragraphs 13(a) – 13(i) were bolded by Edwards, presumably to direct the court's attention

specifically to those statements and/or sentences.

### Paragraph 13(a)

---

[3] Edwards also alleges that paragraph 11 contains defamatory statements, but as paragraph 11 and paragraph 13(a) are identical except in address, they are analyzed together.

Residents of Flint . . . . Also request that you send representatives to Flint as soon as possible for a meeting with us to hear directly from us about our experiences with Mr. Edwards and our **call for an investigation into Mr. Edwards' conduct and the harm his actions have caused.**

### Paragraph 13(b)

This is **dishonest, paternalistic and exploitative** and, we fear, used by Mr. Edwards to **build his own professional and financial power** . . . Far too many residents are exhausted **from Mr. Edwards** [sic] **bullying** . . . Mr. Edwards is **using our crisis and suffering for entertainment, intrigue, exhibitionism, and personal power** that might attract the media and outside readers but are completely inappropriate for the circumstances.

### Paragraph 13(c)

Mr. Edwards' **portrayal of Flint residents as dumb, dirty and vulnerable** to being misled by anyone other than himself started in early 2016, is ongoing, and is misguided and offensive . . .

### Paragraph 13(d)

Contrary to Mr. Edwards' claims, Flint residents were never told that shigella was in our tap water and, as a whole, never stopped using proper hygiene from fear of the water. The allegation that FACHEP announced that they found shigella in Flint water **is a lie.** The allegation that WE caused our own shigella outbreak because we stopped bathing out of fear of the water, **is also a lie.**

### Paragraph 13(e)

What scares us is Mr. Edwards who **uses his position as a scientist to misrepresent us and silence us.**

### Paragraph 13(f)

In May 2016, Mr. Edwards erroneously accused Scott Smith and Water Defense of scaring residents out of bathing . . . . Mr. Edwards also accused Dr. Laura Sullivan and Mr. McElmurry of

5

FACHEP [Flint Area Community Health and Environment Partnership] of causing Flint residents to stop bathing because their research scared us (according to some reports, **Mr. Edwards made the preposterous claim that as many as 80% of us returned to a state of filth). This is insulting and false. It is also blatantly unscientific** because Mr. Edwards did not bother to ask actual Flint residents about our bathing habits **before coming up with this pronouncement.**

### Paragraph 13(g)

To our knowledge, **there is no one in the scientific community overseeing Mr. Edwards' work or the way he uses his power over powerless residents.** As far as we know **there is no one in the scientific community ensuring the integrity and honesty of Mr. Edwards' words, research and activism.** Mr. Edwards has repeatedly **spoken and written about how there are no bacteria or dangerous pathogens in Flint residents' water,** even though he is not a microbiologist nor is he doing mass testing within our homes.

### Paragraph 13(h)

Instead, **Mr. Edwards goes around the country giving talks that dismiss our concerns and calls us 'tribal'** . . . . Shockingly, **Mr. Edwards has gone as far as to declare that the Flint Water Crisis was over 2 years ago** (in 2016) . . . . We need an end to his disruptive presence so that we can finally clean up the mess he has left behind him, focus on healing the rifts he has created between residents, and try to address the real problems plaguing us.

### Paragraph 13(i)

We are reaching out to you, key representatives of the scientific and engineering communities who keep awarding and rewarding Mr. Edwards for his behavior, because **we need full protection from Mr. Edwards immediately.** We also **need an immediate investigation** that puts OUR voices at the center and demands evidence for all claims made by Mr. Edwards. **We ask for a committee that includes academics, professionals, and Environmental Justice leaders who have expertise in abuses of professional power against poisoned communities like Flint.**

6

Id. at 6–8.

Edwards claims that following the May 10, 2018 publication of the Letter, the defendants, "acting individually and in concert," created a webpage www.flintcomplaints.com and a Facebook page to "host, draw attention to, and facilitate the republishing" of the Letter. Id. at 21. Edwards further claims that each of the defendants, "at various times and by various means, re-published the Letter to various audiences and members of the public, including colleagues and other members" of Edwards' professional community and field, and continue to make defamatory statements about him. Id. at 23. In his Supplemental Memorandum, Edwards submitted two additional versions of the Letter, ECF Nos. 26–1, 26-2, in which "[p]rovision was made for non-Flint residents to sign." ECF No. 9, at 21. The second version of the Letter (Exhibit A) includes the signatures of Mays and Lambrinidou. ECF No. 26. The third version (Exhibit B) includes the signatures of all three defendants. Id. With respect to why the first version of the Letter (Exhibit 1) did not contain the signatures of Lambrinidou or Schwartz, Edwards explains:

> The Letter falsely purported to be written and submitted by
> "Residents of Flint" and, in its initial version, was signed only
> by Flint residents. This was false because, on information and
> belief, Schwartz, Lambrinidou, and perhaps others participated
> in writing the Letter. According to an article for the East
> Village, the origins of the Letter were "strategically cloaked a
> little bit because the idea is to avoid its being associated too
> closely with any one individual or individuals." An anonymous
> Facebook page created to disseminate the letter,
> flintcomplaints.com, stated that the Letter was "crafted for us."
> According to an article published in the Roanoke Times,
> counsel for [d]efendants stated he did not know who compiled
> the Letter and, when asked who operated flintcomplaints.com,
> stated "that information isn't public." This explicitly false
> statement that the Letter was entirely the work of Flint residents

7

> – without outside input – was intended to, and did in fact, add
> to the Letter's sting and thereby increase its damaging effect on
> Edwards professional reputation.

ECF No. 9, at 12; ECF No. 27, at 2. Edwards alleges that, "upon information and belief,"

Schwartz, Mays, and Lambrinidou "collaborated, worked on, shared ideas, encouraged one

another, contributed to and generally acted in concert to draft the contents of the Letter."

ECF No. 9, at 12. Elsewhere in his pleadings, Edwards similarly avers that the defendants,

"both individually and acting as conspirators in concert and together, and as members and

representatives of a non-profit organization known as the Campaign for Lead Free Water,

participated in drafting, signing, electronically communicating and/or mailing a damaging

defamatory and tortious letter and email." Id. at 2. Many of the allegedly defamatory

statements in paragraphs 13(a) – 13(i) featured hyperlinks to third-party online materials,

including newspaper articles, blog posts, an audio recording, and a transcript of remarks

made by Edwards at Swarthmore College. Edwards asserts that a review of this hyperlinked

material demonstrates that much of it is factually inconsistent with statements and

accusations contained in the Letter. Id. at 4. Indeed, he asserts that the Letter sent to the

"president of Virginia Tech," as well as numerous academic listservs and scientific

colleagues, is "replete with falsehoods." Id. at 5. In terms of who authored the Letter,

Edwards claims that metadata recovered from and embedded within the Microsoft Word

document containing the Letter indicates that it was "saved on and distributed from . . .

Melissa Mays' computer." Id. at 23. Edwards further states that the Letter may also have

been saved on and distributed from other defendants' computers. Id.

8

In addition to those statements in the Letter, Edwards originally asserted as defamatory or defamatory per se a dizzying array of statements contained in communications purportedly published by the defendants at various times, to various audiences, via various media, including Facebook and Twitter. It was initially unclear to the court which of these communications (and statements contained therein) Edwards was alleging gave rise to causes of action for defamation, which were being offered as circumstantial evidence of intent, which were included in support of Counts III–V only, and which were presented merely to provide context. Following a hearing on October 29, 2018, the court requested, and Edwards later produced, the Supplemental Memorandum. In this memorandum, Edwards identified six communications and/or instances of alleged defamation besides the Letter. ECF No. 27, at 3–6. These additional communications are contained in paragraphs 52, 53, 54, 55, 56, and 63 of the Amended Complaint. Edwards also attached, as discussed above, the second and third versions of the Letter as exhibits. In this Supplemental Memorandum, Edwards also conceded that statements contained in paragraphs 49–51 of the Amended Complaint do not provide a basis for liability under Count I or Count II because they are time-barred by Va. Code Ann. § 8.01-247.1, Virginia's statute of limitations for defamation. The six additional communications, and concomitant statements, are reproduced below, in relevant part, as they were presented in the Amended Complaint:

**Paragraph 52**

On September 9, 2017, Mays stated via Twitter, "The person [Edwards] being talked about betrayed my family. He promised he would fight for us and when he was coopted by the State, he abandoned us."

9

**Paragraph 53**

In late 2017, Lambrinidou made two keynote presentations that, based on information and belief, included false and harmful statements of and concerning Edwards. Attendees live tweeted that an engineer involved in D.C. and Flint [Edwards] was engaged in "structural bullying" and compared Edwards' conduct to sexual harassment and assault victims in the "#metoo" movement.

**Paragraph 54**

On February 27, 2018, Mays made the following false and harmful statements of and concerning Edwards during an interview on CAN TV, an online program available now on YouTube:

As for the filters . . . also . . . Wayne state has been trying to get this study out for a year. The state of Michigan has blocked it . . . as well as some other PhDs (I am not bitter). The tap filters grown [sic] bacteria . . . . Boil the water. We had to find that the hard way because the filters cause Dysentery (shigella) . . . .

From 2014 Hundreds of people in Flint died from pneumonia. Probably undiagnosed legionnaires disease. They are willing to kill people. Why are they killing us off because who will pay the bills? Because they want the land.

**Paragraph 55**

On May 10, Flint residents sent a letter out to the heads of the Scientific and Engineering Communities and Academia asking for an independent committee to come to Flint and hear our stories firsthand of the attacks and intimidation by a certain researcher [Edwards].

[T]he social media, public attacks and intimidation by this researcher [Edwards] have not stopper [sic] and now his students have copied this behavior in a presentation just last week[.]

[Edwards] began another barrage of false accusations to her personally, which is abhorrent behavior for a [p]rofessor[.]

10

### Paragraph 56

Edwards' imperial and colonial version of "saving" us by
denying through gaslighting, intimidation, and ridicule the real
harm that he inflicts on the ground, and by belittling our
knowledge, demands, organizing and mobilization in defense of
our health is corrosive, unethical and not about science in any
sense of the word.

We are carefully watching you [Dr. Cooper and anyone who
supports Edwards].

That Edwards' full-of-untruths story of "heroism" was recently
served to AAAS by citizen science ambassador Dr. Caren
Cooper of North Carolina State University to get Edwards the
prestigious "scientific freedom and responsibility" award, that
Cooper has no direct knowledge about Edwards' work in DC
and Flint, that after nominating Edwards Cooper was granted a
seat on Edwards' $1.9 million EPA project, and that Cooper has
known but has expressed not an iota of curiosity about
community voices protesting Edwards' community work and
the harm that has ensued, are not lost on us.

These statements, published via Facebook by [d]efendant
Schwartz . . .

### Paragraph 63

On June 30, 2018, Melissa Mays published defamatory
statements of and concerning Edwards via Facebook and
Twitter, associated with a photograph of a water hydrant
spewing discolored water that defendants stated had been taken
days earlier. After Edwards['] team demonstrated that the viral
photo was not taken a few days early, but was actually from
2015 during the height of the water crisis, Mays stated:

Here is yet ANOTHER example of Virginia Tech's Marc
Edwards and @flintwaterstudy taking it upon themselves to
attack poisoned Flint residents and call them liars . . . . It's just
appalling that professionals 'investigate' and attack residents,
not the people who poisoned us.

ECF No. 9, at 18–24.

Case 7:18-cv-00378-MFU   Document 32   Filed 03/20/19   Page 11 of 115   Pageid#: 495

Edwards contends that the publication (and apparent republication) of the Letter and the statements reproduced above were part of a "defamatory campaign" lasting "nearly two years," during which the defendants "refused to back down . . . despite [his] repeated attempts to demonstrate the falsity of their statements." Id. at 4–5. In furtherance of this campaign, Edwards claims the defendants (1) "purposefully and repeatedly misquoted [him] and intentionally and falsely attributed damaging statements to him that he never made," (2) "deliberately misquoted or misrepresented publicly available facts and/or articles and documents . . . they [themselves] . . . referred to during their smear campaign," and (3) "disregarded the truth" by ignoring "publicly available information of which they had actual or constructive knowledge that contained true facts inconsistent with [their] false statements." Id. at 4. He alleges that the Letter, taken as a whole, as well as the individual statements excerpted in paragraphs 13(a) – 13(i), falsely imply that he "violated ethical obligations required by members of his profession," including obligations outlined in the American Society of Civil Engineering Code of Ethics. Id. at 12. He further asserts that the Letter implies that he "lacks integrity and is unfit to perform his professional duties" and resulted in permanent stigmatization. Id. Edwards, of course, flatly denies the truth of all of these purported implications.

**B.**

In support of his contention that the defendants acted with "actual malice" and "common law malice," Edwards cites (1) the defendants' continued publication of statements containing falsehoods despite his efforts to apprise them of their falsity, as well as

12

(2) the defendants' improper motives for continuing to publish said falsehoods despite an awareness of their falsity.

Edwards claims to have made numerous efforts to "dissuade [the defendants] from repeatedly publishing false statements" through "conciliatory emails"[4] and text messages[5] to the defendants "requesting opportunities to explain the falsity of [their] aspersions." Id. On May 23, 2017, for example, after he first learned of the Letter, Edwards claims to have emailed and/or engaged in other correspondence with the defendants (1) "challenging its misrepresentations," (2) "providing clarifications and supporting citations [for] his statements that were intentionally mischaracterized in the Letter," and (3) "attempting to demonstrate the falsity of the Letter's statements and misattributions." Id. at 29. Edwards also claims to have requested documentation supporting the allegedly false statements in the Letter. Id. The defendants reportedly responded to these overtures by publishing additional defamatory statements, including labeling his correspondence and associated media comments as "threats," and by republishing the defamatory Letter on a website and elsewhere. Id. Edwards also allegedly published several blog posts on www.flintwaterstudy.org "debunking" the defendants' false statements. Id. at 27. In one such post, published on May 4, 2014 and titled, "Direct Response to Public Assertions and Insinuations Made Against Us By a Few Individuals," Edwards "attempted to counter

---

[4] On May 14, 2017, Edwards emailed Schwartz and Lambrinidou, stating "[your] comments are so far off base and inaccurate, I do not even know where to begin. It is sickening." ECF No. 9, at 28. Edwards' email allegedly detailed several factual errors. Id. On May 15, 2017, Edwards again emailed Schwartz: "I'd love to discuss your Facebook post . . . and also hear actual examples of how I denigrated Flint residents, or stole credit from Flint resident [sic]. Not just your unsubstantiated comments, but please cite some actual examples." Id. Schwartz allegedly responded to this email on May 31, 2017: "…The time for conversation and debate is long past." Id.

[5] On or about December 16, 2016, Edwards claims to have sent Mays numerous texts in which he requested she stop making false statements about him: e.g., "That is false and you know it, yet you keep saying it anyway." Id. at 26.

[d]efendants statements accusing him of unethical conduct." Id. at 28. In another post, titled, "Correcting Some Misconceptions About Our 9/15/2017 Press Conference: Lead Data," Edwards "attempted to correct factually false attacks by the [d]efendants" through (1) clarifying that he had not said Flint water was "safe," (2) disputing claims that he had not been transparent or respectful, (3) and explaining why it was incorrect to claim that he made the unqualified statement that the "the Flint water crisis was over." Id. at 29. Lambrinidou allegedly responded to this latter post with "more than a dozen tweets disparaging Edwards." Id.

Taken together, Edwards maintains that these exchanges via email, text message, Facebook, and blog posts indicate that "[d]efendants had knowledge of falsity, or recklessly disregarded the truth, when making defamatory statements[,] including those alleged in paragraph 13." Id. Lastly, Edwards avers, upon information and belief, that defendants were aware that in response to the Letter, representatives from the American Association for the Advancement of Science met with Flint residents and found that the Letter's myriad allegations did not warrant further investigation, which "demonstrated the factually false nature of the statements alleged in paragraph 13." Id. at 29–30.

Furthermore, Edwards claims that the defendants had "various and overlapping motives to damage [him]," including "financial, professional, and social incentives to make negative and damaging statements regarding [him] and his work." Id. at 4, 16. The nature of these alleged "incentives" varies widely by defendant.

Lambrinidou, for example, purportedly "harbors severe animosity" toward Edwards following, among other things, a romantic falling-out, as well as a professional estrangement

14

related to disagreements over collaborative research projects and a course ("Engineering Ethics and the Public") they co-taught from 2007-2010 at Virginia Tech. Id. at 13–17. Edwards states that he and Lambrinidou decided to cease co-teaching the Virginia Tech course together, and initially agreed that Edwards would "lead teaching of the course." Id. at 14. Edwards claims that shortly thereafter, he and Lambrinidou began to "have disputes regarding intellectual property," with Lambrinidou questioning whether Edwards could continue to teach the course they co-developed or "put into practice ideas they had jointly developed and published." Id. at 15. Edwards claims to have suggested on multiple occasions that they address these and other concerns through faculty mediation services at Virginia Tech, but that Lambrinidou declined to participate in this program. Id. at 15. "[U]pon information and belief," Edwards asserts that Lambrinidou made "repeated negative statements" about him to Schwartz and Mays, who "believe that Edwards had treated Lambrinidou wrongfully." Id. at 15–16.

Mays, according to Edwards, possesses a "vested financial interest in generating attention in the Flint Water Crisis." Id. at 16. More specifically, Mays is allegedly the "named plaintiff in a multi-million-dollar class action lawsuit involving the Flint water crisis, alleging harm to her family from lead and copper exposure." Id. at 16. Edwards claims to have exposed and reported Mays' manipulation of water samples using a Virginia Tech lead test kit to the United States Environmental Protection Agency in 2016. Id. at 17. Edwards further claims that by manipulating test results, Mays "demonstrated dangerous levels of lead in her water." Id. at 16. Mays allegedly admitted violating testing protocols to Edwards in person, but nevertheless "gave false results to the media in a manner to promote her

15

lawsuit." Id. at 16–17. Edwards claims he was "obligated to provide evidence of Mays['] falsified results to the Environmental Protection Agency, which funded the work." Id. at 17.

More generally, Edwards claims that the defendants (1) have made numerous statements expressing resentment or jealously toward the credit and accolades he has received, (2) expressed animosity towards him because they "believe he represents government interests and does not perform objective water testing," and (3) "harbor severe animosity" towards him due to "differences regarding community activism" and "other issues surrounding the Flint water crisis." Id. at 16. Edwards claims that it was this accumulated animus toward him that propelled the publication (and republication) of the Letter and other bad-faith conduct on the part of the defendants. On June 27-28, 2018, for example, Edwards claims:

> Mays, Lambrinidou, and Schwartz directed and sent false and harmful statements via social media posts to the W.K. Kellogg Foundation, the Engagement Scholarship Consortium, and the Association of Public and Land Grants [sic] University, that included but were not limited to republication of the defamatory Letter quoted above, and affirmatively discouraged these professional organizations and foundations from awarding Edwards' team at Virginia Tech awards or any other positive recognition. Edwards and his team were finalists for a prestigious award and cash prize, and the [d]efendants purposefully targeted re-publication of the Letter to influence the selection process.

Id. at 24. Further, Edwards claims that on July 18-19, 2016, the defendants, as well as others, formed a group known as the Campaign for Lead Free Water, which "has attempted to establish expertise and credibility, in an area of research and advocacy in which Edwards has received international recognition," and "holds itself out as operating in competition with Edwards' professional work and team at Virginia Tech." Id. at 17.

16

In Count IV and Count V, Edwards alleges that the defendants' "concerted smear campaign" was part of an ongoing civil conspiracy to "attack and damage" his professional reputation and "demonize[ ] [him] and his work to the public at large as well as [to] specific individuals and subsets within Edwards' professional community." Id. at 17. Edwards claims generally that many of the allegedly defamatory statements "contain false implications of fact damaging to [his] reputation, including but not limited to the implication that [he] has engaged in unethical, inappropriate and/or illegal conduct sufficient to provide the basis for a formal complaint and initiate an investigation." Id. at 30. Edwards claims that the defendants' tortious conduct resulted in damages and in fact harmed him by (1) diminishing his ability to procure grant funding, (2) stunting his career development, (3) negatively affecting his eligibility for professional awards and commendations, (4) permanently diminishing his potential earning capacity, and (5) causing him and his family severe emotional distress. Id. at 30–31. More specifically, Edwards claims (1) that colleagues otherwise inclined to nominate him for professional awards and prizes have expressed reluctance to do so because of fears they would be "targeted," (2) that research sponsors have expressed concern to him regarding the defendants' "public attacks" and accusations that he engaged in unethical behavior, (3) that he has been retained for far fewer speaking engagements since the publication of the Letter, and that those who do book him have requested proof of liability insurance, and (4) impairment of his ability to raise funds via crowd source initiatives, to expose environmental injustices, and to conduct his "life's work and passion." Id. at 31–32.

## C.

In their motion to dismiss and subsequent filings, the defendants assert a variety of grounds for dismissal. In support of their motion to dismiss for want of personal jurisdiction, the defendants claim that they are not residents of Virginia and that there are insufficient minimum contexts with Virginia to confer either general or specific jurisdiction. ECF No. 13, at 41–42. They further assert that a finding of personal jurisdiction would offend notions of fair play and substantial justice given the "unconscionable burden" and "inconvenience" it would place on Mays and the "compelling state interest Michigan has over the health, safety, and welfare of her denizens." Id. at 4. In support of their motion to dismiss Count I and Count II for failure to state a claim, the defendants assert that the statements made by or attributed to them about Edwards are "substantially true by his own words" bearing citations to the "public record" with "reasonable interpretations drawn therefrom," and, in any event, constitute non-actionable, protected opinion in the context of a "heated debate about matters of public concern and science." Id. at 3; ECF No. 22, at 2.

The defendants further contend that Edwards' lawsuit represents a "cynical attempt" to "strip the residents of Flint of their right to self-determination by replacing their voices with the judgment of Virginians," and "seeks to embroil this [c]ourt in a public policy debate over the history and future of the City of Flint, with the battle lines set between those seeking community empowerment by allowing residents to speak for themselves versus those with a preference for scientific paternalism." ECF No. 13, at 1–2. The defendants also assert that Edwards has failed to plausibly allege that they acted with "actual malice," which is the appropriate standard given Edwards' status as a public figure. Id. at 19. With respect to the remaining counts, the defendants assert that Edwards has failed to plead several elements

18

essential to sustain Count III for tortious interference, and that his claims for civil conspiracy (both common law and statutory) in Count IV and Count V are redundant and fail for, among other reasons, lack of any non-speculative harm. Id. at 1, 14.

The court will first address the veritable thicket of jurisdictional questions presented by this case, and then proceed to address the defendants' motion to dismiss as to Count I and Count II for defamation per se and defamation, respectively. For reasons stated below, the court will not address Counts III–V.

## II.

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." Carefirst of Md. Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted). However, where, as here, the court considers a challenge to personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction, rather than show jurisdiction by a preponderance of the evidence. Id. (citing Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). "The court, in deciding whether a plaintiff has met this burden, must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Brooks v. Motsenbocker Advanced Devs., Inc., 242 F. App'x. 889, 890 (4th Cir. 2007). "If a plaintiff makes the requisite showing, the defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to violate due process."

19

Reynolds Foil, Inc. v. Pai, No. 3:09cv657, 2010 WL 1225620, at *1 (E.D. Va. Mar. 25, 2010) (quoting Burger King v. Rudzewicz, 471 U.S. 462, 477–78 (1985)). "For purposes of the motion to dismiss, the reviewing court may presume that any uncontradicted evidence submitted by either party is true." Id.

The court employs the traditional two-step analysis to resolve the personal jurisdiction dispute at issue. Therefore, the court must first decide whether Virginia's long-arm statute, Va. Code Ann. § 8.01-328.1,[6] permits the court to exercise personal jurisdiction over the defendants, and second, whether the exercise of such jurisdiction comports with the due process requirements of the Fourteenth Amendment. See, e.g., Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997). Virginia's long-arm statute extends personal jurisdiction to the extent permitted by due process, and therefore "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." Young v. New Haven Advocate, 315 F.3d 256, 261 (4th Cir. 2002) (quoting Stover v. O'Connell Assocs., Inc., 84 F.3d 132, 135–36 (4th Cir. 1996)). The inquiry becomes whether the defendants maintain sufficient minimum contacts with the forum state so as not to offend "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the

---

[6] For reasons discussed below, the court has determined that Virginia's choice of law provisions hold that Virginia law applies in this case.

forum state also provide the basis for the suit." Carefirst, 334 F.3d at 397. "If the defendant's contacts with the [s]tate are also the basis for the suit, those contacts may establish specific jurisdiction . . . . [I]f the defendant's contacts with the [s]tate are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the [s]tate." ALS Scan, Inc. v. Dig. Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (citing Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 & n.8–9 (1984)). Edwards properly asserts only specific jurisdiction pursuant to Va. Code Ann. § 8.01-328.1.[7]

To determine whether specific jurisdiction exists, the Fourth Circuit has adopted a three-part test. The court must consider: "(1) whether the defendant purposefully availed [herself] of the privileges of conducting activities in the forum state, (2) whether the plaintiff's claim arises out of the defendant's forum-related activities, and (3) whether the exercise of personal jurisdiction over the defendant would be constitutionally reasonable." Young, 315 F.3d at 261. In relation to the first factor, "no clear formula [exists] for determining what constitutes 'purposeful availment.'" Reynolds Foil, 2010 WL 1225620, at *2. However, "[i]f, and only if . . . the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the court] move on to a consideration of prongs two and three." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009). "The second prong of the test for specific jurisdiction . . . requires that the defendant's contacts with the forum state form the basis of the suit." Id. at 278–79 (citing Burger King, 471 U.S. at 472).

---

[7] Edwards notes that Lambrinidou at one point taught courses at various Virginia Tech campuses in the Commonwealth of Virginia. Edwards does not claim, however, that Lambrinidou's contacts with Virginia in her capacity as an adjunct professor gave rise to any claims alleged in this case or that they are sufficient to confer general jurisdiction.

21

The third prong of the specific jurisdiction test "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." Id. at 279.

In Count I and Count II, Edwards "incorporate[d] by reference . . . all of the allegations appearing elsewhere in this [c]omplaint." ECF No. 9, at 32–33. In its review of the pleadings, the court struggled to determine with any precision which of Edwards' sundry "allegations" were intended to support which claims for relief. Moreover, it was evident that although asserting one count of defamation per se (Count I) and one count of defamation (Count II), subsumed within these counts were statements contained in the Letter sent via email to Virginia Tech on May 10, 2018,[8] and numerous other statements arising out of, among other things, the defendants' social media activity. Edwards' incorporation-by-reference approach placed the onus of sorting allegations scattered throughout his pleadings on the court. The resulting confusion between the parties and the court required the latter to order Edwards to submit a supplemental brief specifying which statements, besides those contained in the Letter, he was alleging constituted actionable defamation. Edwards' Supplemental Memorandum directed the court's attention to six communications: (1) Mays' September 9, 2017 Twitter post alleged in paragraph 52, (2) Lambrinidou's late 2017 "keynote presentations" alleged in paragraph 53, (3) Mays' February 27, 2018 interview on

---

[8] Edwards alleges that the Letter was re-published on other dates. Virginia follows the "single publication rule," which permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons. See Morrissey v. William Morrow Co., 739 F.2d 962 (4th Cir. 1984); see also Restatement (Second) of Torts § 557A(4) (1997). While subsequent distribution of a defamatory statement may continue to increase plaintiff's compensable damages, it does not create independent actions or start the statute of limitations running anew. See Zuck v. Interstate Publ'g Corp., 317 F.2d 727, 729–30 (2d Cir. 1963) (holding that publication of libelous newspaper gave rise to a single cause of action accruing once upon distribution to the public).

22

CAN TV, "an online program available now on YouTube," alleged in paragraph 54, (4) a Facebook post ostensibly published by all three defendants on a Facebook page titled Flint Complaints, alleged in paragraph 55,[9] (5) a Facebook post purportedly published by Schwartz on May 22, 2018, alleged in paragraph 56, and a (6) June 30, 2018 Twitter post by Mays alleged in paragraph 63. Edwards contends generally that the court has jurisdiction over these communications.

The Internet presents unique challenges to establishing personal jurisdiction over nonresident defendants. It has been long held that the purposeful availment prong of the personal jurisdiction analysis can be met if a defendant's "intentional conduct [in the foreign state was] calculated to cause injury to [the plaintiff] in [the forum state]." Calder v. Jones, 465 U.S. 783, 791 (1984) ("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."). Calder, however, does not vest jurisdiction in a state merely because it serves as the locus of the plaintiff's injury. See Walden v. Fiore, 571 U.S. 277, 278 (2014) ("[M]ere injury to a forum resident is not a sufficient connection to the forum."). The "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Id.

---

[9] Edwards fails to indicate the date of publication for any of the statements in paragraph 55. The court is therefore unable to determine whether these statements were made within the statutory period. See 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1309 (1990) ("In libel and slander suits, the time and place of the publication should be specifically stated in the complaint."). Federal pleading standards require that a plaintiff specifically allege each act of defamation. English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc., No. 97-2397, 1999 WL 89125, at *3 (4th Cir. Feb. 23, 1999) (unpublished) (citing Caudle v. Thomason, 942 F. Supp. 635, 638 (D.D.C. 1996) ("[I]n order to plead defamation, a plaintiff should allege specific defamatory comments [including] the time, place, content, speaker, and listener of the alleged defamatory matter.")).

23

In the Internet context, the Fourth Circuit, "adopting and adapting" a three-part test posited in Zippo Manuf. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997), frames the Calder "effects" test as follows: "a [s]tate may, consistent with due process, exercise judicial power over a person outside of the [s]tate when that person (1) directs electronic activity into the [s]tate, (2) with the manifested intent of engaging in business or other interactions within the [s]tate, and (3) that activity creates, in a person within the [s]tate, a potential cause of action cognizable in the [s]tate's courts." ALS Scan, 293 F.3d at 714.

The Fourth Circuit provided relevant guidance on the application of this standard in Young. 315 F.3d at 256. There, two Connecticut newspapers and their staff allegedly defamed a Virginia prison warden, Stanley Young, by posting articles online discussing Connecticut's policy of housing prisoners in Virginia facilities. Id. at 258–59. Warden Young argued, per Calder:

> [T]hat the district court has specific personal jurisdiction over the newspaper defendants . . . because of the following contacts between them and Virginia: (1) the newspapers, knowing that Young was a Virginia resident, intentionally discussed and defamed him in their articles, (2) the newspapers posted the articles on their websites, which were accessible in Virginia, and (3) the primary effects of the defamatory statements on Young's reputation were felt in Virginia.

Id. at 261–62. The Fourth Circuit rejected Young's argument, noting that the place where Young felt the effects of the allegedly libelous statements was relevant to the jurisdictional analysis, but "emphasized how important it is . . . to look at whether the defendant has expressly aimed or directed its conduct toward the forum state." Id. at 263 (citation omitted). The dispositive question, according to the Fourth Circuit, was "whether the newspapers

24

manifested an intent to direct their website content . . . discussing conditions in a Virginia prison . . . to a Virginia audience." Id. In other words, the mere "act of placing information on the Internet" is not sufficient by itself to "subject[ ] that person to personal jurisdiction in each [s]tate in which the information is accessed" as, otherwise, a "person placing information on the Internet would be subject to personal jurisdiction in every [s]tate," and the "traditional due process principles governing a [s]tate's jurisdiction over persons outside of its borders would be subverted." Id. (citation omitted).

Here, Edwards asserts only specific personal jurisdiction over the defendants, and therefore the court must have jurisdiction over each claim that it decides. See Gatekeeper Inc. v. Stratech Sys., Ltd., 718 F. Supp. 2d 664, 667–68 (E.D. Va. 2010) ("[T]hough the Fourth Circuit has yet to address this issue, the three courts of appeal that have done so have sensibly concluded that specific jurisdiction requires a claim-specific analysis."); see also Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274 (6th Cir. 2006) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 1351, at 299 n.30 (2004) ("There is no such thing as supplemental specific personal jurisdiction; if separate claims are pled, specific personal jurisdiction must independently exist for each claim and the existence of personal jurisdiction for one claim will not provide the basis for another claim.")).

Importantly, and as explained above, the court cannot, having determined that personal jurisdiction exists over a defendant with respect to one claim, use that claim to exert personal jurisdiction over the same defendant with respect to other claims that do not otherwise support such jurisdiction. See Helicopteros, 466 U.S. at 414; see also Remick v.

25

Manfredy, 238 F.3d 248, 255 (3d Cir. 2001). For the reasons explained below, Edwards has failed to make a prima facie showing of specific personal jurisdiction as to the six claims arising out of the defamatory communications alleged in paragraphs 52, 53, 54, 55, 56, and 63 of the Amended Complaint.

## A.

Edwards cannot satisfy the Calder "effects" test, as elucidated in Young, to establish this court's jurisdiction over his claims that arise out of the defendants' social media activity (paragraphs 52, 55, 56, 63), Lambrinidou's late 2017 keynote presentations and related "live tweet[s]" made by an unnamed third party (paragraph 53),[10] or Mays' February 27, 2018 interview on CAN TV, apparently available on YouTube (paragraph 54). Though alleging numerous instances of defamation arising out of communications on various media, Edwards does not separate these claims and/or causes of action into separate counts. Nor does he apparently regard any of the six additional communications identified above as separate claims for the purposes of establishing personal jurisdiction. That these six additional claims were pled collectively and presented under two umbrella counts, however, belies the fact that each constitutes a discrete cause of action arising under distinct circumstances for which a separate jurisdictional analysis is required. In other words,

---

[10] Insofar as Edwards is alleging that an attendee's live tweeting of statements allegedly made by Lambrinidou supports the exercise of specific jurisdiction over her as to those statements, this position is meritless, as "[d]ue process requires that a defendant be haled into court in a forum [s]tate based on [her] own affiliation with the [s]tate, not based on the 'random, fortuitous, or attenuated' contacts [she] makes by interacting with other persons affiliated with the [s]tate." FireClean LLC v. Tuohy, No. 1:16-CV-294-JCC-MSN, 2016 WL 4414845, at *6 (E.D. Va. June 14, 2016) (citing Burger King, 471 U.S. at 475 (1985) ("[The] purposeful availment requirement [of due process] ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the unilateral activity of another party or a third person.")). Therefore, even if Edward had presented evidence that the attendee's tweets were directed at Virginia or received by an audience in Virginia, such evidence would be irrelevant in determining whether specific jurisdiction is exercisable over Lambrinidou. There is no evidence in the record that she produced, endorsed, or directed the tweets in question.

26

Edwards' pleading numerous instances of defamation under two counts does not relieve him of establishing, nor the court of evaluating, jurisdiction on a claim-by-claim basis. Indeed, "it is well-settled that 'repeated defamations do not constitute a [single] continuing tort,'" but rather, "as courts have uniformly recognized, each separate defamatory statement itself constitutes a separate and distinct cause of action." Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 917 (E.D. Va. 2004) (citation omitted); Hoai Thanh v. Ngo, No. CIV. PJM 14-448, 2015 WL 2227923, at *2 (D. Md. May 8, 2015), aff'd sub nom. Hoai Thanh v. Hien T. Ngo, 694 F. App'x 200 (4th Cir. 2017) (holding that "[e]very alleged defamatory statement constitutes a separate instance of defamation, which a plaintiff must specifically allege"); see also English Boiler, 1999 WL 89125 at *3 (holding that in a defamation claim, "[a] plaintiff may not baldly allege a broad course of conduct over a lengthy period of time and later sue on any act that occurred during that time period," and that "[e]ach act of defamation is a separate tort . . . a plaintiff must specifically allege"). Thus, the court must assess whether there is a basis for exercising jurisdiction over each of the seven communications Edwards alleges contained defamatory statements, i.e., the Letter, plus the six communications described above.

The relevant legal principle requiring this court to individually assess defamatory communications of the kind alleged in this case is illustrated in McNeil v. Biaggi Productions, LLC, where the plaintiff appeared to allege that because the defendants "deliberately communicated via telephone and email with a third party located in Virginia" (Count 5), the court was permitted to exercise jurisdiction over other allegedly defamatory statements disseminated via Facebook, Twitter, and a blog (Counts 1–4 & 6–11) concerning

27

the same or similar subject matter as the "telephone [call] and email." No. 3:15CV751, 2017 WL 2625069, at *5-8 (E.D. Va. June 16, 2017). In addition to advancing a theory of ancillary specific jurisdiction, the plaintiff invoked the Calder "effects" test theory of jurisdiction. The McNeil court reiterated that mere injury to a Virginia resident is not a sufficient connection to Virginia, and therefore, per Young, posting defamatory statements on social media, without more, does not constitute purposeful availment. The court then rejected McNeil's ancillary specific jurisdiction argument, refusing to allow those communications which did not arise from contacts with Virginia to piggyback on Count 5, which did involve communications (and statements) which the court concluded were expressly directed at Virginia. Id. at *8. Vis-à-vis those statements made during the "telephone [call] and email" to a police department in Virginia alleged in Count 5, the court held that "[t]hat contact supports a finding of personal jurisdiction on Count V, which alleges defamation stemming from those precise communications. It does not, however, provide the [c]ourt with a basis to extend its jurisdictional reach to other, unrelated claims." Id. The McNeil court allowed the case to proceed based solely on those communications contained in Count 5. In support of this communication-specific approach, the McNeil court cited Gatekeeper Inc. v. Stratech Sys., Ltd., 718 F. Supp. 2d 664, 667-69 (E.D. Va. 2010), where the court held that "if specific personal jurisdiction over a defendant with respect to one cause of action were sufficient to allow a plaintiff to allege a series of other claims not arising from the defendant's forum state contacts . . . then th[e] important distinction between general and specific jurisdiction would be significantly attenuated, if not eviscerated." This court finds

28

the reasoning in <u>McNeil</u> and <u>Gatekeeper</u> persuasive and will proceed by assessing the jurisdictional basis for each communication (and cause of action) alleged in the present case.

**B.**

Edwards asserts that statements contained in the six communications identified in the Supplemental Memorandum (1) "caused tortious injury . . . in the Commonwealth of Virginia, and, seemingly as an afterthought, that defendants (2) transmitted these communications "directly to Virginia Tech via social media." ECF No. 9, at 2; <u>see</u> <u>also</u> ECF No. 29, at 29 (same). No additional factual matter is proffered in support of the second generalized assertion, and although the court must construe the pleadings, affidavits, and other supporting documents in the light most favorable to Edwards, it need not "credit conclusory allegations or draw farfetched inferences." <u>Masselli & Lane, PC v. Miller & Schuh, PA</u>, 215 F.3d 1320 (4th Cir. 2000) (citation omitted); <u>see</u> <u>Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.</u>, 784 F. Supp. 306, 310 (D.S.C. 1992) (holding that a plaintiff's showing of personal jurisdiction must be based on specific facts set forth in the record in order to defeat defendants' motion to dismiss); <u>see also</u> <u>Boykin Anchor Co., Inc., v. AT & T, Corp.</u>, No. 5:10–CV–591–FL, 2011 WL 1456388, at *2 (E.D.N.C. Apr. 14, 2011). In addition to the Fourth Circuit's express rejection in <u>Young</u> of jurisdiction undergirded solely on tortious injury in the forum, the weakness of Edwards' showing vis-à-vis the statements alleged in paragraphs 52, 53, 54, 55, 56, and 63 is underscored by the holdings of numerous courts in the Fourth Circuit and beyond in cases involving the publication of allegedly defamatory statements on websites or social media feeds.

29

In FireClean, LLC v. Tuohy, for example, the district court dismissed a defamation case for lack of personal jurisdiction where the underlying claims arose from articles posted on a firearms blog and various social media websites, including Facebook. No. 1:16-CV-0294, 2016 WL 3952093, at *3 (E.D. Va. July 21, 2016). The allegedly defamatory posts and articles in FireClean questioned whether the plaintiff's product, a gun oil used to lubricate firearms and reduce carbon residue buildup, was any different than ordinary cooking oil. Id. at *2. In one article published by defendant Tuohy, initially entitled "Lies, Errors, and Omissions," Tuohy stated that FireClean is a "common vegetable oil, with no evidence of additives for corrosion resistance or other features," and closed by criticizing the plaintiff for not being "entirely truthful about [their product], the way it works, or what it contains," and misleading consumers into buying their product at a markup under the belief that the "bottle of vegetable oil was the most advanced gun lube on the planet." Id. at *2–3. FireClean LLC, a Virginia company, filed suit in Virginia alleging multiple counts of defamation.

The court applied the Fourth Circuit's analysis in Young, ultimately dismissing the case after concluding that it lacked personal jurisdiction over the defendants. The court rejected FireClean's argument that jurisdiction exists in the state where the plaintiff experienced reputational harm, despite the fact that: (1) Tuohy exchanged non-defamatory "emails, text messages, Facebook messages, and occasionally phone calls" with the company (in Virginia), (2) FireClean had sent Tuohy samples of its lubricant from Virginia, (3) 90 of the 9,181 people who "liked" Tuohy's allegedly defamatory Facebook posts were located in Virginia, and (4) some Virginia servers may have processed Tuohy's online content. Id. at *5. The court underscored that these contacts neither form the basis of the plaintiff's

30

defamation claim, nor do they evince purposeful targeting of Virginia. Id. at *5–7. In relation to the Facebook "likes" specifically, the court held that such "contacts" "appear[ed] completely 'random, fortuitous, or attenuated.'" Id. at *6 (citation omitted); see Binion v. O'Neal, 95 F.Supp.3d 1055, 1060 (E.D. Mich. 2015) (holding that posting offensive pictures of the plaintiff on Instagram and Twitter did not constitute the defendant's purposefully availing himself of the forum). The court explained that rather than demonstrating a manifested intent to direct electronic activity into Virginia, Tuohy's articles and comments were apparently directed to a "nationwide marketplace of consumers of firearms and associated equipment." Id.

Here, as in FireClean, Edwards has not made a prima facie showing that any of the communications alleged in paragraphs 52, 53, 54, 55, 56, and 63 specifically or purposefully targeted a particular forum, let alone Virginia. There is no factual matter in Edwards' pleadings suggesting that the authors of these communications took affirmative steps to direct these communications into Virginia or had any intent to target or focus on Virginia readers or otherwise avail themselves of the benefits and protections of the laws of Virginia. Nor are there any facts indicating that a Virginia resident, or anyone at Virginia Tech, read, "liked," reposted, or was even aware of the communications in question. Indeed, Edwards failed to present any evidence that any Virginia resident, for example, subscribed to, "friended," "retweeted," or "followed" any of the defendants' social media accounts or commented upon the posts in question, or that the accounts themselves had a geographic focus. Lastly, there are no facts suggesting that any of the communications were published from Virginia, routed through servers located in Virginia, or were of special interest to

31

Virginia readers. While it may be the case that Edwards' reputation, professional or otherwise, was damaged in Virginia, as discussed above, the "Fourth Circuit ha[s] brushed back attempts to vest jurisdiction in a [s]tate based entirely or predominantly on the locus of the plaintiff's injury." Id. at *7.

The court, on this record, cannot determine with any certainty the nature of defendants' contacts with Virginia vis-à-vis the claims identified in the Supplemental Memorandum.[11] Furthermore, that the allegedly defamatory post in paragraph 63 mentions Virginia Tech by name is insufficient to confer specific jurisdiction over Mays as to that claim. The McNeil court reached a similar conclusion:

> While the [d]efendants featured McNeil as the subject of these posts and even referenced Virginia in some of them, nothing indicates that the [d]efendants specifically directed the posts at Virginia or to Virginia social media users. Without more, the [c]ourt cannot find purposeful availment on those eleven claims. See FireClean, LLC v. Tuohy, No. 1:16cv0294, 2016 WL 3952093, at *7 (E.D. Va. July 21, 2016) ("The mere fact that Tuohy referenced a Virginia company, its product, and its owners without mentioning Virginia does not demonstrate an intent to target Virginia, as even overt references to a [s]tate may be jurisdictionally insufficient if the focus of the article is elsewhere.").

2017 WL 2625069, at *8.

In sum, although Edwards alleges that the defendants "directed numerous defamatory statements . . . directly to Virginia Tech via social media," there is no support, by affidavit or exhibit, indicative of incidental, let alone purposeful, targeting of Virginia Tech

---

[11] That the defendants knew or may have had reason to believe that Edwards resided and/or worked in Virginia is irrelevant. Knowledge of these facts alone does not itself demonstrate targeting of Virginia as the focal point of allegedly defamatory statements. See Knight v. Doe, No. 1:10-CV-887, 2011 WL 2471543, at *3 (E.D. Va. June 21, 2011) (citing Griffis v. Luban, 646 N.W.2d 527, 536 (Minn. 2002)).

(or Virginia) as to the claims in paragraphs 52, 53, 54, 55, 56, and 63.[12] Neither the statements themselves nor the social media platforms from which they were published uniquely target Virginia or would have inherently included a substantial number of Virginia residents or businesses. With respect to the two keynote presentations referenced in paragraph 53, Edwards does not indicate where Lambrindiou made these presentations, and the publication by a third-party attendee of whatever defamatory statements were ostensibly made during those presentations, as previously discussed, is insufficient to confer jurisdiction. See Headstrong Corp. v. Jha, No. CIVA 305CV813-HEH, 2007 WL 1238621, at *4 (E.D. Va. Apr. 27, 2007) (no personal jurisdiction where defamatory emails were merely re-published in Virginia "after being forwarded by innumerable individuals from India across the world"). Fourth Circuit precedent applying the Calder test leads inexorably to the conclusion that the exercise of jurisdiction over these claims is inappropriate. To the extent Edwards bases Count I and Count II on statements alleged in paragraphs 52, 53, 54, 55, 56, and 63, the motion to dismiss for lack of personal jurisdiction is **GRANTED**. These claims are **DISMISSED without prejudice**. With that, the sole remaining source of liability are the allegedly defamatory statements contained in the Letter.

## C.

---

[12] In Hawbecker v. Hall, 88 F. Supp. 3d 723, 729 (W.D. Tex. 2015), the district court, referring to and partly relying on Fourth Circuit precedent, denied defendant Hall's motion to dismiss, stating that because the defendant "expressly aimed online contacts to Texas residents and intended the focal point and brunt of her posts and interactions to be felt by Hawbecker in Texas," specific jurisdiction was proper. Unlike the facts sub judice, in Hawbecker, the plaintiff (1) provided alleged Facebook posts and emails between Hall and Texas residents as exhibits to the complaint. Id. In one such Facebook post, Hall states that Hawbecker "lives and works in San Antonio, Texas so please pass the word on to any one [sic] that you may know there," apparently to publicize her allegations of child sexual abuse to Texas residents. Id. Hawbecker also provided a record of a Facebook message exchange between Hall and a Nebraska resident in which Hall states her allegation and demonstrates knowledge that Hawbecker resides in Texas. Lastly, facts were presented that Hall personally contacted Hawbecker's friends, relatives, students, and employer in Texas via Facebook. Id.

Notwithstanding the dismissal of the claims above, the court will exercise specific jurisdiction over Mays as to the communication (and statements contained therein) "at the heart of this case," namely the Letter sent via email to Timothy Sands, the president of Virginia Tech. ECF No. 21, at 4. Here, Edwards' averments satisfy the three-part test articulated by the Fourth Circuit allowing the exercise of jurisdiction in the Internet context. With respect to the first prong—direction of electronic activity in the forum—Edwards avers that the "defendants each, both individually and acting as conspirators in concert and together, and as members and representatives of a non-profit organization known as the Campaign for Lead Free Water, participated in drafting, signing, electronically communicating and/or mailing" the Letter to Edwards' employer, Virginia Tech. ECF No. 9, at 2. More specifically, Edwards claims that the Letter was sent to the president of Virginia Tech, Timothy Sands, (1) via email to president@vt.edu, and (2) via Twitter in a tweet to the "handle" @VTSandsman. Id. at 5. With respect to the second prong, Edwards' pleadings also adequately show that the email and accompanying Letter, on their face, evince a manifest intent to target Virginia Tech. Lastly, Edwards has adequately alleged that the Letter "creates . . . a potential cause of action [for defamation] cognizable" in Virginia. Id.

It is well established that transmission into the forum state of a communication can constitute purposeful availment if the content of that communication directly gives rise to an intentional tort cause of action. Here, the defamation claim arising from the Letter sent to the president of Virginia Tech, like the telephone call and email alleged in Count 5 in McNeil, manifests an intent to engage in interactions within Virginia. The Letter was clearly directed and "expressly aim[ed]" at a Virginia resident with the intent to effectuate an

34

outcome in Virginia which, according to Edwards, was to "attack and damage [his] professional reputation" and "discredit [his] work in his professional capacity as an employee of a University owned by the Commonwealth [of Virginia]." ECF No. 21, at 29. Where an allegedly defamatory communication has been sent to particular recipient, courts have been willing to exercise specific jurisdiction. Indeed, cases involving analogues to emails, such as faxes, phone calls, and letters made or sent by out-of-state defendants to forum residents are routinely held to support specific jurisdiction when they directly give rise to the cause of action. See, e.g., Neal v. Janssen, 270 F.3d 328, 332 (6th Cir. 2001); Oriental Trading Co. v. Firetti, 236 F.3d 938, 943 (8th Cir. 2001); Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 212–13 (5th Cir. 1999).

While case law involving defamation-by-email is less plentiful, several district courts have exercised specific jurisdiction over out-of-state emailers. See, e.g., Aitken v. Commc'ns Workers of Am., 496 F. Supp. 2d 653, 660–61 (E.D. Va. 2007) (holding specific jurisdiction is proper where the "causes of action are directly related to the transmission of the allegedly tortious emails"); Middlebrook v. Anderson, No. Civ. A. 3:04–CV–2294, 2005 WL 350578, at *3–*4 (N.D. Tex. Feb. 11, 2005) (citing several decisions recognizing specific jurisdiction based, at least in part, on emails sent into forum state); Mark Hanby Ministries, Inc. v. Lubet, No. 1:06–CV–114, 2007 WL 1004169, at *11 (E.D. Tenn. Mar. 30, 2007); Long v. Grafton Exec. Search, LLC, 263 F.Supp.2d 1085, 1089 (N.D. Tex. 2003) (defendant sent defamatory email to employment agency in Texas); Zidon v. Pickrell, 344 F.Supp.2d 624, 632 (D.N.D. 2004) (defendant particularly and directly targeted the forum with, inter alia, emails).

35

In their motion to dismiss for want of personal jurisdiction, defendants argue that their alleged actions were "not predicated upon [Edwards'] work, acts or relationship with [Virginia] nor did they seek to effectuate an outcome in Virginia." ECF No. 13, at 40. Instead, the defendants contend that the Letter focused on Edwards' acts or omissions in Michigan, "in his capacity as a de facto agent of the state of Michigan and the federal government." Id. at 5, 40. Further, they claim that the only jurisdictionally salient acts are the "transmission of one or two tweets or emails from outside [Virginia]" that went to dozens of individuals and organizations within the scientific and engineering communities writ large, of which Virginia Tech is only one institution out of many. Id. In short, the defendants assert that there was no purposeful availment, and that any tortious injury in Virginia was, at most, incidental.

The record, however, indicates that the sender(s) of the email (and Letter) specifically contemplated an "effect" in Virginia. The email containing the Letter was specifically addressed to the president of Virginia Tech, and requested that "you," (president of Virginia Tech), (1) "send representatives to Flint as soon as possible for a meeting . . . to hear directly from us about our experiences with Mr. Edwards," and (2) conduct an investigation into Edwards' conduct and "the harm his actions have caused." ECF No. 9–1. Thus, while it may have been the intention of the sender(s) to affect Edwards' conduct primarily as it relates to Flint, Michigan, there was clearly an intent to also affect Edwards at Virginia Tech. Indeed, the Letter, which paints a highly unflattering picture of Edwards, closes with the following statement: "We are reaching out to you, key representatives of the scientific and engineering communities who keep awarding and rewarding Mr. Edwards for his behavior, because we

36

need full protection from Mr. Edwards immediately. We also need an immediate investigation . . . ." Id. These statements clearly contemplate that some action be taken in Virginia by Virginia Tech to address Edwards' alleged misbehavior.

The argument that "one or two tweets or emails" is insufficient to establish purposeful availment is, as discussed above, without merit. In their own motion, the defendants concede that the "touchstone of this [jurisdictional] analysis is the quality, as opposed to quantity, of the contacts with the forum," such that "even a single contact may be sufficient" to satisfy minimum contacts. ECF No. 13, at 39 (citing Carefirst, 334 F.3d at 397); see McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223–24 (1957) (recognizing jurisdiction based on defendant's single contact with forum state). With respect to the Letter specifically, its transmission was not a "random, fortuitous, or attenuated" contact with Virginia, nor was the Letter "simply place[d] on the Internet" in a passive manner. See ALS Scan, 293 F.3d at 714 (citation omitted). In light of the targeted nature of the email sent directly to the president of a university located in Virginia, and given the potential consequences to Edwards' career and contemplated "effect" of the email, this transmission suffices to sustain a finding of purposeful availment as to whatever defamatory statements are connected with this communication only.

Having established that whomever sent the Letter via email to the president of Virginia Tech did so purposefully, i.e., with the manifest intent that some action be taken in Virginia, and that said transmission creates a potential cause of action cognizable in Virginia, the question then becomes whether Edwards has adequately connected each of the defendants to the transmission in question. In connection with Mays, Edwards specifically

37

alleges that "[p]ublicly available metadata from the Microsoft W[ord] document of the defamatory Letter . . . indicates the Letter was saved on and distributed from . . . Melissa Mays' computer (the Letter may have also been saved on and distributed from other defendants' computers)." Id. at 23. Edwards also avers that Mays "first created and employed [the] 'dumb and dirty' catchphrase [redolent of language found in the Letter] when she attacked Edwards in [a] New York Times Magazine article" published in 2016. Id. at 25. Lastly, Edwards' Exhibit 1 indicates that Mays was a signatory to the Letter. While it is true, of course, that metadata suggesting the Letter was saved on Mays' computer does not prove definitively that it was also distributed from her computer, the allegations circumstantially connecting to her to its transmission, construed in the light most favorable to Edwards, suffice, if only just barely, to support the court's finding that Edwards has carried his burden as to Mays.

Edwards' allegations connecting Schwartz and Lambrinidou to the transmission of the Letter, however, are, as one court put it, "gossamer thin and reed slender." Clark v. Milam, 830 F. Supp. 316, 324 (S.D.W. Va. 1993). His contention that the defendants, "both individually and acting as conspirators in concert and together . . . participated in . . . electronically communicating and/or mailing a damaging defamatory and tortious letter and email" to Virginia Tech is factually unsupported. See Gillison v. Lead Express, Inc., No. 3:16CV41, 2018 WL 6537151, at *4 (E.D. Va. Dec. 12, 2018) (citing Machulsky v. Hall, 210 F. Supp. 2d 531, 537 (D.N.J. 2002) for the proposition that "[a]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's . . . motion to dismiss for lack of personal jurisdiction" (citation omitted)). Indeed, Edwards concedes that the Letter

38

only "may have . . . been saved on and distributed from other defendants' computers." ECF No. 9, at 23. To compensate for factual deficiencies as to these two defendants, Edwards quotes an article in the East Village Magazine explaining that "the origins of the Letter were 'strategically cloaked a little bit because the idea is to avoid being associated too closely with any one individual or individuals.'" Id. at 12. He further claims that an anonymous Facebook page and website (Flintcomplaints.com) were created to disseminate the Letter and that at some point a post on the Facebook page indicated that the Letter was "crafted for us," referring to Flint residents. Id. From these indeterminate allegations, Edwards asks the court to infer and/or speculate that Schwartz and Lambrinidou were not only involved in drafting the Letter, but in transmitting it to Virginia Tech. This is neither a reasonable inference nor one which the court is willing to make on this record. The motion to dismiss Schwartz and Lambrinidou for lack of personal jurisdiction is **GRANTED**.[13]

### D.

Finally, "even assuming the requisite minimum contacts between [Virginia] and [Mays], notions of fair play and substantial justice [must not] counsel against jurisdiction." Foster v. Arletty Sarl, 278 F.3d 409, 415 (4th Cir. 2002). Indeed, the exercise of personal jurisdiction must be "constitutionally reasonable." Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 216 (4th Cir. 2001). Typically, such an analysis "ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." CFA Inst. v. Inst. of Chartered

---

[13] To be sure, Edwards has not yet had the opportunity to develop and present the relevant jurisdictional evidence. Under different circumstances, the court would allow for leave to amend. However, because the court finds below that Edwards fails to state a claim upon which relief can be granted as to alleged defamation arising from the Letter, this allowance is unnecessary.

Fin. Analysts of India, 551 F.3d 285, 296 (4th Cir. 2009). When determining the reasonableness issue, courts examine (1) the defendant's burden, (2) the forum state's interests, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d 424, 429 (Fed. Cir. 1996) (citation omitted).

Mindful of these considerations, the court finds its exercise of jurisdiction as to Mays would comport with "fair play and substantial justice," i.e., it is constitutionally reasonable. Int'l Shoe, 326 U.S. at 316. The court already noted that there was nothing "random, fortuitous, or attenuated" about the transmission of the Letter to Virginia Tech. See Revell v. Lidov, 317 F.3d 467, 476 (5th Cir. 2002) ("Fair play and substantial justice" is a fairness inquiry that "captures the reasonableness of hauling a defendant from [her] home state before the court of a sister state; in the main a pragmatic account of reasonable expectations - if you are going to pick a fight in Texas, it is reasonable to expect that it be settled there."). Virginia has a strong interest in providing effective means of redress for its residents, including Edwards, who is also an employee of a public research university located in Virginia. Edwards also has an interest in litigating in his home state, and his interest in effective and efficient litigation is also satisfied in Virginia. The burden placed upon Mays in litigating in Virginia simply is not so great as to make unfair on that basis alone the exercise of jurisdiction. Lastly, the judicial system's interest in efficient litigation is also served by litigating defamation cases in the state where the statements were clearly directed and in which an "effect" was clearly contemplated. Mays has not met her burden of presenting

40

other considerations that would make it unreasonable for the court to assert jurisdiction. Thus, the court holds that it may exercise specific jurisdiction over Mays vis-à-vis the allegedly defamatory statements contained in the Letter only. The motion to dismiss for lack of personal jurisdiction is **DENIED** to this extent. The court will proceed to the defendants' motion to dismiss for failure to state a claim.

## III.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint; it does not generally resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) ("In considering a motion to dismiss, we accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff.").

A complaint establishes facial plausibility "once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Nemet Chevrolet, Ltd. v. Consumeraffairs.com. Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). Therefore, the complaint need not include "detailed factual allegations" as long as it pleads "sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." Id. However, "naked assertions of wrongdoing necessitate some factual

41

enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). While a court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

The importance of "evaluat[ing] complaints early in the process" in response to Rule 12(b)(6) motions has been emphasized by the United States Supreme Court and the Fourth Circuit as a way to deal with "the recognized problems created by 'strike suits' and the high costs of frivolous litigation." Arthur v. Offit, No. CIV.A. 01:09-CV-1398, 2010 WL 883745, at *3 (E.D. Va. Mar. 10, 2010) (citing Francis, 588 F.3d at 193). Indeed, because the defense of baseless defamation claims imposes an additional cost, in the form of potentially deterred speech, federal courts have historically given close scrutiny to pleadings in libel actions. Id. (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure 3d § 1357 ("When the claim alleged is a traditionally disfavored 'cause of action,' such as . . . libel, or slander, the courts [tend] to construe the complaint by a somewhat stricter standard and [are] more inclined to grant a Rule 12(b)(6) motion to dismiss.")). Therefore, "courts in Virginia and the Fourth Circuit routinely dismiss at the outset defamation claims that are based on constitutionally protected speech . . . ." Id.

## A.

The court must first determine what documents it may consider before turning to the merits of the motion to dismiss. In evaluating the sufficiency of a complaint in connection

with a motion to dismiss, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013); see also Bosiger v. U.S. Airways, 510 F.3d 442, 450 (4th Cir. 2007). In other words, the court's analysis at the motion to dismiss stage is typically informed and constrained by the four corners of the complaint. CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009). There are two limited exceptions allowing a court to consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. Goldfarb v. Mayor & City Council of Balt., 791 F.3d 500, 508 (4th Cir. 2015). The first exception permits a court to properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ."[14] Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (citations omitted); see U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014) (citation omitted). Under the second exception, a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." Goines, 822 F.3d at 166 (citations omitted). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC, 794 F. Supp. 2d

---

[14] The court may clearly consider all three versions of the Letter submitted by Edwards, as those documents are properly considered as within the four corners of the pleadings. Fed. R. Civ. P. 10(c) (stating that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes"); E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." (citing Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)).

602, 611 (D. Md. 2011). In a case cited approvingly by the Fourth Circuit concerning the

latter exception, the Third Circuit explains:

> The rationale underlying this exception is that the primary
> problem raised by looking to documents outside the
> complaint—lack of notice to the plaintiff—is dissipated
> "[w]here plaintiff has actual notice . . . and has relied upon these
> documents in framing the complaint." What the rule seeks to
> prevent is the situation in which a plaintiff is able to maintain a
> claim of fraud by extracting an isolated statement from a
> document and placing it in the complaint, even though if the
> statement were examined in the full context of the document, it
> would be clear that the statement was not fraudulent.

Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004)

(citation omitted).

The only exhibits attached by Edwards are the three versions of the Letter described

above. The defendants, on the other hand, attached numerous documents (Exhibits 1–7)

that were referred to, albeit oftentimes only obliquely or cursorily, in Edwards' pleadings.[15]

The defendants also urge the court to take judicial notice of numerous extrinsic documents,

including a variety of online newspaper articles about the Flint water crisis, law review

articles, and other miscellaneous literature. Edwards concedes that "in certain circumstances

the [c]ourt may take judicial notice or rely on documents referred to in a complaint when

deciding a motion to dismiss." ECF No. 21, at 25–26. However, Edwards argues that the

materials proffered by the defendants, and the defendants' factual arguments that certain

---

[15] Exhibit 1 is a New York Times Magazine article titled, "Flint's Water Crisis and the 'Troublemaker' Scientist"; Exhibit 2 is a transcript of presentation Edwards delivered titled, "Truth Seeking in an Age of Tribalism: Lessons from the Flint Water Crisis"; Exhibit 3 is an email allegedly sent by Edwards to the email account, flintcomplaint@gmail.com responding to the Letter; Exhibit 4 is copy of the East Village Magazine article referenced above; Exhibit 5 is a newspaper article titled, "Virginia Tech's Flint research professor accuses ex-colleagues of defamation"; Exhibit 6 is blog post allegedly posted on Flintwaterstudy.org; Exhibit 7 contains another email exchange between the parties.

44

allegedly defamatory statements are substantially true, are untimely and must be raised at trial or summary judgment. Id. at 2.

Except for Exhibit 2, the court finds either that it need not or it would be inappropriate to consider the aforementioned exhibits and materials at the motion to dismiss stage. See Goines, 822 F.3d at 166 (citing Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.")); Smith v. Hogan, 794 F.3d 249, 255 (2d Cir. 2015) (document with "no independent legal significance to [plaintiff's] claim" was not integral to complaint); see also Corbett v. Duerring, 780 F. Supp. 2d 486, 494 (S.D.W. Va. 2011) (holding that "[a]lthough the parties have offered multiple newspaper articles as exhibits, the court cannot consider or take judicial notice of these articles on a . . . motion to dismiss"); Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records"). In regard to defendants' Exhibit 2, however, the court finds that this document, containing a transcript of remarks Edwards made during a presentation titled "Truth Seeking in an Age of Tribalism: Lessons from the Flint Water Crisis," is integral to the pleadings and incorporated by reference.

Notably, and as preliminary matter, Edwards does not challenge the veracity or authenticity of any the material submitted by the defendants; rather, he "contests [d]efendants' interpretation, spin, selective quotations, and arguments made in reference to these documents," and "adamantly disagrees with the factual import [they] assign to these documents." ECF No. 21, at 2, 26. Edwards does not submit that the transcript itself, active

45

hyperlinks to which are featured in multiple versions of the Letter submitted in his pleadings, misquoted or otherwise inaccurately characterized his remarks. The transcript appears to be a verbatim record of Edwards' statements during a presentation at Swarthmore College.[16] In any event, Edwards himself explicitly references and relies on the transcript in support of his general claim that the defendants "themselves provided links to documents (including audio recordings and transcripts) that were inconsistent with their defamatory statements." Id. at 4. More specifically, Edwards' relies on the contents of Exhibit 2 to buttress his claim of actual malice (and falsity) vis-à-vis allegedly defamatory statements contained in paragraph 13(h), stating, "[t]he word 'tribal' never appears in the transcript of [his] presentation that is referred to in the Letter . . . ." ECF No. 9, at 27. Edwards also explicitly appeals to "the context of the entire Letter and the circumstances of [its] publication" in support of the claim that paragraph 13(h) would be understood by an "objective reader" to imply he is "racist, bigoted, and/or prejudiced against minorities and/or poor individuals." Id. at 11. In urging the court consider paragraph 13(h) in "the context of the entire Letter," Edwards naturally invites consideration of the transcript, which is part of that context. See Adelson v. Harris, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), aff'd, 876 F.3d 413 (2d Cir. 2017) (rejecting defendant's argument that a hyperlink differs from a footnote because it is not within the document's "four corners" as "formalism that is misplaced in Internet defamation

---

[16] Though hyperlinks to Exhibit 2 were included in as exhibits submitted in plaintiff's pleadings, Edwards did not submit the content behind these hyperlinks, and it is not clear that inclusion via hyperlink qualifies a document as "explicitly incorporated" or "attached" to the complaint. See Hampton v. Root9b Techs., Inc., No. 15-CV-02152-MSK-MEH, 2016 WL 7868823, at *4 (D. Colo. Aug. 3, 2016), aff'd, 897 F.3d 1291, Fed. Sec. L. Rep. P 100227, 2018 WL 3614570 (10th Cir. 2018).

law"). For the foregoing reasons, the court may consider Exhibit 2 without converting the motion to dismiss into one for summary judgment.

**B.**

This court has diversity jurisdiction over this suit pursuant to 28 U.S.C. § 1332, and as such, must apply Virginia's choice-of-law rules. Cretella v. Kuzminski, 3:08–CV–109, 2008 WL 2227605, at *2 (E.D. Va. May 29, 2008); see also Pa. Emp., Benefit Trust Fund v. Zeneca, Inc., 710 F.Supp.2d 458, 466 (D. Del. 2010) (noting that before addressing a motion to dismiss, "the [c]ourt must first resolve the choice of law question to determine the applicable law relevant to each [claim]"). To determine the governing law in a defamation case, Virginia applies the lex loci delicti commissi rule, that is, the law of the place of the wrong. Fluor Enters. v. Mitsubishi Hitachi Power Sys. Ams., 2018 U.S. Dist. LEXIS 100934, at *8 (E.D. Va. June 15, 2018). In defamation cases, Virginia courts apply the substantive law of the state where the defamatory statements were first published. See Lapkoff v. Wilks, 969 F.2d 78, 81 (4th Cir. 1992) (applying Virginia law). When the alleged defamation is executed via email correspondence, the place of publication is dictated by the place where the email was opened and read. Galustian v. Peter, 561 F.Supp.2d 559, 565 (E.D. Va. 2008), rev' in part on other grounds, 591 F.3d 724 (4th Cir. 2010).

Edwards has not specifically alleged where the May 10, 2018 email was opened and read. In Velocity Micro, Inc. v. J.A.Z. Mktg., Inc., No. 3:11-CV-473, 2012 WL 3017870, at *6 (E.D. Va. July 23, 2012), the district court confronted an analogous deficiency in the plaintiff's pleadings. The court held that although "J.A.Z. has not alleged with specificity where the email was opened and read . . . it is probable that, as a Minnesota corporation, it

47

occurred in Minnesota." Id. The court further held that "[a]s J.A.Z. . . . has not pled for the adoption of another state's defamation laws, this court applies the relevant Minnesota law governing defamation." Id.

Here, because Virginia is where Virginia Tech maintains its principal place of business, and because the email containing the Letter was sent to a Virginia Tech administrator, it is, applying the reasoning from Velocity, "probable" that publication occurred in Virginia. Further, as in Velocity, the parties have not pled for the adoption of another state's defamation laws. Therefore, this court applies the relevant Virginia law governing defamation.[17] The court's analysis must also include considerations of federal law, because, as will be discussed below, the requirement that an allegedly defamatory statement be of fact, rather than opinion, flows from the First Amendment. See Snyder v. Phelps, 580 F.3d 206, 217–18 (4th Cir. 2009), aff'd, 562 U.S. 443 (2011) ("It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment.").

## C.

To state a claim for defamation under Virginia law, a plaintiff must allege: (1) publication of (2) an actionable statement with (3) the requisite intent. Schaecher v. Bouffault, 290 Va. 83, 91, 772 S.E.2d 589, 594 (2015) (citing Tharpe v. Saunders, 285 Va. 476, 480, 737 S.E.2d 890, 892 (2013)). In Virginia, a statement is defamatory per se if it "imputes an unfitness to perform the duties of a job or a lack of integrity in the performance

---

[17] Edwards is correct that defendants' pleadings cites to Virginia law without addressing potential choice of law issues. Edwards does not object to the application of Virginia law. ECF No. 21, at 13.

of the duties" or "prejudices the party in [his or] her profession or trade." Yeagle v. Collegiate Times, 255 Va. 293, 297, 497 S.E.2d 136, 138 (1998) (citing Fleming v. Moore, 221 Va. 884, 889, 275 S.E.2d 632, 635 (1981)); see also Besen v. Parents and Friends of Ex– Gays, Inc., No. 3:12cv204, 2012 WL 1440183, at *3 (E.D. Va. Apr. 25, 2012). If a plaintiff proves defamation per se, "Virginia law presumes that the plaintiff suffered actual damage to its reputation and, therefore, [the plaintiff] does not have to present proof of such damages." Swengler v. ITT Corp. Electro–Optical, Prods. Div., 993 F.2d 1063, 1071 (4th Cir. 1993) (citation omitted).

The first element—whether there was a publication—is not seriously in dispute. The second and third elements, however, are disputed. The second element of a defamation claim in Virginia requires an "actionable statement." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993). To be "actionable," a statement must be not only false, but also defamatory, that is, it must "tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Id. (citing Restatement (Second) of Torts § 559). "[M]erely offensive or unpleasant statements" are not defamatory; rather, defamatory statements "are those that make the plaintiff appear odious, infamous, or ridiculous." Id.; see also Robert D. Sack, Libel, Slander and Related Problems § 2.4.1 (1980) ("There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing, or that hurts the plaintiff's feelings, without more, is not actionable."). In order for a statement to be potentially false, it must also be factual. See Tharpe 285 Va. at 476, 737 S.E.2d at 893. Therefore, "statements of opinion are generally not actionable because such statements cannot be objectively

49

characterized as true or false." Jordan v. Kollman, 269 Va. 569, 575–76, 612 S.E.2d 203, 206 (2005). Virginia's highest court has stated that "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person[,] cannot form the basis of a common law defamation action." Yeagle, 255 Va. at 293, 497 S.E.2d at 137 (1998).

Virginia law also recognizes defamation per quod, i.e., defamation by implication. See, e.g., Pendleton v. Newsome, 290 Va. 162, 172, 772 S.E.2d 759, 763 (2015) ("In Webb, we reiterated that Virginia law recognizes a claim for defamation by inference, implication or insinuation."). In order to state a claim for defamation by implication, a plaintiff must allege: "(1) that the defendants made the statements alleged in the complaint, (2) that the statements, even if facially true, were designed and intended by the defendants to imply [the defamatory meaning], (3) that in the light of the circumstances prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) that the plaintiff suffered harm as a result." Id. "In determining whether words and statements complained of in the case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." Webb v. Virginian-Pilot Media Cos., LLC, 287 Va. 84, 89–90, 752 S.E.2d 808, 811 (2014). That said, "the meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation." Carwile v. Richmond Newspapers, 196 Va. 1, 82 S.E.2d 588, 591–92 (1954). Indeed, a plaintiff may not extrapolate beyond the "plain and natural" meaning of words. Id. It is for the court to decide (1) whether a statement has a provably false factual connotation and (2) whether a statement

50

is capable of having a defamatory meaning injurious to the plaintiff's reputation. See CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280, 294 (4th Cir. 2008).

While it is well-established that expressions of opinion are generally protected, determining whether a given statement is opinion or fact "presents oftentimes nettlesome problems . . . as the evanescent distinction may be hazy at times." Carto v. Buckley, 649 F. Supp. 502, 506 (S.D.N.Y. 1986). In Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990), the Supreme Court described two subcategories of speech protected by the First Amendment. The first involves statements that are not "provable as false," meaning the language cannot be proved true or false by a "core of objective evidence" or by reference to an "objectively verifiable event." Id. at 21–22. In other words, a statement is not actionable unless it asserts a demonstrably false fact "subject to objective verification." Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 184 (4th Cir. 1998). This category also involves statements of subjective belief based on disclosed facts, as when "bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the [statement] [as] anything but the opinion of the author drawn from the circumstances related." Chapin, 993 F.2d at 1093; see Biospherics, 151 F.3d at 185 (collecting cases). The second category described in Milkovich involves statements that "cannot reasonably [be] interpreted as stating actual facts," meaning "loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining" an actual fact, or where the "general tenor" negates the impression that actual facts are being asserted. 497 U.S. at 20–21 (quoting Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988)). This second safeguard includes protection for "rhetorical hyperbole" and "vigorous epithet." Id. at 17, 21; see CACI, 536 F.3d at 301–02 (endorsing a district court

51

holding that a statement remains protected if it is "clear to all reasonable listeners that [the statement is] offered . . . as exaggerated rhetoric intended to spark the debate").

The third element of defamation is intent. The requisite level of intent associated with a defamation action varies depending upon the plaintiff's status as a "public figure," a "private figure," or a "limited-purpose public figure." Spencer v. Am. Int'l Grp., Inc., No. CIV. 3:08CV00591, 2009 WL 47111, at *4 (E.D. Va. Jan. 6, 2009). In certain circumstances, constitutional law treats private citizens, who are not otherwise public figures, as public figures for the purpose of comment on a particular public controversy. See, e.g., Hutchinson v. Proxmire, 443 U.S. 111, 134–35 (1979); Wolston v. Reader's Digest Assoc., 443 U.S. 157, 164–68 (1979).

Limited-purpose public figures are those who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974). In voluntarily injecting themselves into a particular controversy, these individuals thereby become public figures for a limited range of issues. Id. 361. These individuals are subject to the heightened "actual malice" intent standard for two reasons: (1) because of "their ability to resort to the 'self-help' remedy of rebuttal" by virtue of the fact that they "usually enjoy significantly greater access [to the media] than private individuals, which enable them to counter criticism and to expose the falsehood and fallacies of defamatory statements"; and (2) because they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood," and hence are "less deserving of protection." Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1552 (4th Cir. 1994). The actual malice standard reflects our "profound national commitment to the

principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures. N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). The question of whether a defamation plaintiff is a "limited-purpose public figure" is an issue of law. See Reuber v. Food Chem. News, Inc., 925 F.2d 703, 708 (4th Cir.) (en banc), cert. denied, 501 U.S. 1212 (1991).

## D.

Whether a plaintiff is a limited-purpose public figure depends upon "the nature and extent of [the] individual's participation in the particular controversy giving rise to the defamation." Gertz, 418 U.S. at 352. The Fourth Circuit has set forth five factors to guide lower courts in this inquiry, including whether: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation." See Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 668 (4th Cir. 1982), cert. denied, 460 U.S. 1024 (1983). Typically, the second and third Fitzgerald factors are combined into what is often considered the dispositive question at the core of the inquiry: "whether the plaintiff had voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome." Id.

Though Edwards refused to stipulate during the October 29, 2018 hearing that he qualifies, at the very least, as a limited-purpose public figure, the court easily concludes that

53

this status is appropriate, and that his claims should be scrutinized according to the New York Times "actual malice" standard. It can hardly be debated that the allegedly defamatory statements giving rise to this matter are related to an existing public controversy – that is, "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." Foretich, 37 F.3d at 1554 (quoting Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1296 (D.C. Cir.), cert. denied, 449 U.S. 898 (1980)). The Flint water crisis (and the advocacy-related disputes arising therefrom) plainly qualifies as a public controversy as there are "foreseeable and substantial ramifications for persons" beyond the litigants in this suit. Waldbaum, 627 F.2d at 1296. Likewise, it is pellucidly clear that Edwards had "access to channels of effective communication," as demonstrated the (1) pervasive media coverage of his work by national newspapers, such as the New York Times, and local publications, including East Village Magazine, (2) the numerous recognitions Edwards received from large national magazines, such as Time Magazine, and (3) his apparent operation of and/or contribution to various social media platforms and websites. ECF No. 9, at 3, 13, 27.[18]

In 2004, Time Magazine recognized Edwards as among the four most important innovators in water around the world. Id. at 3. In 2016, Edwards was recognized: (1) again by Time Magazine as among the 100 most influential people in the world, (2) by Fortune Magazine as among the world's 50 greatest leaders, etc. Id. Edwards also received a White House presidential faculty fellowship in 1996 and other prestigious awards for his work in

---

[18] Edwards indicated that he operates and/or contributes to a blog, from which he (and a student) "published blog posts debunking [d]efendants' false statements." ECF No. 9, at 27.

Flint and beyond. Id. Indeed, in 2016, Edwards claims that he was even "short-listed among Flint whistleblowers as Time [Magazine's] person(s) of the year." Id. That same year, New York Times Magazine published a lengthy profile of Edwards. Id. at 17. Edwards was also the subject of numerous other newspaper articles and testified in several high-profile congressional hearings and criminal cases in Michigan related to the Flint water crisis. Id. at 25. It cannot be said, given Edwards' public visibility, that his conduct did not inevitably invite public comment and attention.

Indeed, Edwards clearly "thrust[ ] . . . his personality into the 'vortex' of [this] important public controversy." Curtis Publ'g. Co. v. Butts, 388 U.S. 130, 155 (1967). Edwards, by his own admission, has assumed a role of special prominence in the Flint water controversy and has used his position to influence the resolution and outcome of this crisis. See Wells v. Liddy, 186 F.3d 505, 534 (4th Cir. 1999); accord Chapin, 993 F.2d at 1092 n.4 (finding "plaintiffs' status as 'public figures' [to be] irretractably admitted on the face of the complaint" where the complaint "extol [led] [the plaintiffs'] nationwide charitable activities . . ."). Moreover, the controversy, and Edwards' entry into it, clearly existed prior to the publication of the Letter on May 10, 2018. The challenged Letter was, in fact, responding directly to disputes arising out of Edwards' Flint-related advocacy work. Finally, as for the fifth Fitzgerald factor, the record demonstrates that Edwards retained his limited-purpose public figure status at the time of the alleged defamation. For the aforementioned reasons, Edwards qualifies, at a minimum, as a limited-purpose public figure required to show that

Case 7:18-cv-00378-MFU   Document 32   Filed 03/20/19   Page 55 of 115   Pageid#: 539

the allegedly defamatory statements were made with knowing falsity or with reckless disregard for the truth. <u>Curtis</u>, 388 U.S. at 155.[19]

## IV.

Under Virginia and federal law, Edwards has failed to state a claim for defamation upon which relief can be granted as to Count I and Count II. The court thoroughly reviewed the Letter as a whole and each of the allegedly defamatory statements in paragraphs 13(a) – 13(i) in the context in which they were made, as well as all of the parties' arguments. Many of the statements alleged in paragraph 13 plainly qualify as constitutionally protected opinion under <u>Milkovich</u> and its progeny because they are incapable of being proven true or false by a core objective evidence or are so tightly wrapped in loose, figurative, or hyperbolic language that they cannot be reasonably interpreted as stating or implying actual facts. Those few statements appearing to assert verifiable facts either lack the requisite defamatory sting, or are of such a character that a reasonable reader would recognize them as expressing only the speakers' subjective views on contested and emotionally-fraught matters of public concern. In assessing paragraphs 13(a) – 13(i), it is the task of the court not only to determine whether a statement is capable of a defamatory meaning, but also to "examine . . . the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment . . . protect." <u>N.Y. Times</u>, 376 U.S. at 285.

## A.

---

[19] <u>See</u> <u>Chapin</u>, 993 F.2d at 1091–92 ("[T]he First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern. Where, as here, all of these considerations are present, the constitutional protection of the press reaches its apogee.").

56

Though the Supreme Court held in Milkovich that there is no "separate constitutional privilege for 'opinion,'" as discussed above, a statement is constitutionally protected if it "does not contain a provably false factual connotation." 497 U.S. at 20–21. In determining whether a statement can be reasonably interpreted as declaring or implying a falsehood or containing a "provably false connotation," the Fourth Circuit has adopted the "thoughtfully elaborated" four-factor test from Ollman v. Evans, 750 F.2d 970 (D.C. Cir 1984), cert. denied, 471 U.S. 1127 (1985). See Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1288–89 (4th Cir. 1987). These factors include: (1) the author or speaker's choice of words; (2) whether the challenged statement is capable of being objectively characterized as true or false; (3) the context of the challenged statement within the writing or speech as a whole; and (4) the broader social context into which the statement fits.[20] See Hanks v. WAVY Broad., LLC, No. 2:11CV439, 2012 WL 405065, at *9 (E.D. Va. Feb. 8, 2012) (citations omitted). The second factor is a minimum threshold issue that all plaintiffs must meet to sustain a cause of action - if words cannot be described as true or false, they are not actionable. Id. (citing Potomac Valve, 829 F.2d at 1287–88); see also Biospherics, 151 F.3d at 184 (recognizing that Milkovich, like Potomac Valve, placed "primary emphasis . . . on verifiability of the statement").[21]

---

[20] Though not explicitly endorsed in Milkovich, this four-factor test provides a framework for conducting essentially the same analysis using nearly identical indicia to distinguish between opinion and fact. See Milkovich, 497 U.S. at 24 (J., Brennan, dissenting). Indeed, the Fourth Circuit, although noting that Milkovich declined to explicitly adopt the Ollman framework, appears to approve the use by lower courts of its four-factor test in framing their analysis. See, e.g., PBM Prod., LLC v. Mead Johnson Nutrition Co., 678 F. Supp. 2d 390, 401 (E.D. Va. 2009), aff'd sub nom. PBM Prod., LLC v. Mead Johnson & Co., 639 F.3d 111 (4th Cir. 2011).
[21] See Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1288 (4th Cir. 1987) ("Even when a statement is subject to verification, however, it may still be protected if it can best be understood from its language and context to represent the personal view of the author or speaker who made it.").

57

The Fourth Circuit makes clear that to appropriately construe a statement in light of what might reasonably have been understood therefrom, it is incumbent upon courts to look not just at the allegedly defamatory words themselves, but also at the context and general tenor of its message. See Snyder, 580 F.3d at 219; Biospherics, 151 F.3d at 184.[22] This imperative derives from the court's "oblig[ation] to assess how an objective, reasonable reader would understand a challenged statement . . . ." Id. Indeed, even if a statement is objectively verifiable, it "nevertheless qualifies as an 'opinion' if it is clear from any of the three remaining Ollman factors, individually or in conjunction, that a reasonable reader or listener would recognize its weakly substantiated or subjective character—and discount it accordingly." Hanks, 2012 WL 405065, at *9 (citation omitted). It also provides assurance that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has "traditionally added much to the discourse of our Nation." Milkovich, 497 U.S. at 20. Finally, this imperative reflects "the reality that exaggeration and non-literal commentary have become an integral part of social discourse" and is "very much the coin of the modern realm." Levinsky's, Inc. v. Wal–Mart Stores, Inc., 127 F.3d 122, 128 (1st Cir. 1997); compare Letter Carriers v. Austin, 418 U.S. 264, 284–86 (1974) (holding that use of the word "traitor" to define a worker who crossed a picket line was non-actionable because no reasonable reader could believe the word was used literally in the context of a labor dispute) with Flamm v. Am. Ass'n of Univ. Women, 201 F.3d 144, 147 (2d Cir. 2000)

---

[22] Virginia law also requires an examination of context. See Hyland v. Raytheon Tech. Servs. Co., 670 S.E.2d 746, 751 (2009) ("In determining whether a statement is one of fact or opinion, a court may not isolate one portion of the statement at issue from another portion of the statement . . . [r]ather, a court must consider the statement as a whole."); Schaecher , 290 Va. at 101, 772 S.E.2d at 599 (holding that "[a]s with all evaluations of defamatory statements, however, context is of the utmost importance"); see also Yeagle, 255 Va. at 297–98, 497 S.E.2d at 138 (upholding dismissal of claim after "considering the phrase at issue in the context of the entire article").

58

(holding that "[e]xaggerated rhetoric may be commonplace in labor disputes, but a reasonable reader would not expect similar hyperbole in a straightforward directory of attorneys and other professionals . . . [i]ndeed, the opposite is true" "in light of the inclusion of the statement in an otherwise fact-laden directory"). Turning to the facts of the present case, the court will apply the above Ollman factors to the Letter, and each of the statements specifically flagged by Edwards.

## B.

With respect to the fourth factor—the broader social context into which the statements alleged in paragraphs 13(a) – 13(i) fit—Edwards concedes that the tortious conduct that is the gravamen of this litigation "occurred in the context of an ongoing public debate regarding the well-known water and public health crisis in Flint, Michigan," noting that the defendants "harbor severe animosity toward [him] due to differences arising from their involvement in the Flint water crisis." ECF 21, at 1, 11. Edwards asserts, however, that the presence of a public debate does not provide license to intentionally publish falsehoods injurious to his reputation. The court agrees on both points. It is self-evident that the disagreements between the parties, recapitulated in Letter, are inextricably intertwined with the highly publicized health crisis in Flint, Michigan. The extent of the contamination of Flint's municipal water supply, once revealed, drew national media coverage and generated an emotionally supercharged public discourse, of which the Letter and many of the social media posts by and between the parties may properly be considered a part. In January 2016, both the state of Michigan and the federal government declared states of emergency in Flint, Michigan, and the crisis led to numerous congressional hearings, partisan finger-pointing,

59

and substantial litigation.[23] See In re Flint Water Cases, 329 F. Supp. 3d 369, 380 (E.D. Mich. 2018), vacated, (Nov. 9, 2018) ("To date, the crisis remains unresolved . . . . Lawsuits are now pending in at least seven different state and federal courts in Michigan.").

Edwards is also correct that notwithstanding a commitment to "uninhibited, robust, and wide-open" debate on public issues, which may include "vehement, caustic, and sometimes sharp attacks," N.Y. Times Co., 376 U.S. at 278, 282 n.21, 292 n.30, the presence of a controversy does not provides carte blanche to publish falsehoods that impugn the reputation of another. That said, inasmuch as such a controversy informs the way in which a reasonable reader would interpret any given claim uttered in this context, the fact that the parties are "opposing partisans in a heated and emotional public health debate," ECF No. 22, at 21, shades every statement made in the Letter. See Underwager v. Channel 9 Austl., 69 F.3d 361, 366–67 (9th Cir. 1995) (observing that audience would likely view comments made in context of "heated debate" on a "highly controversial subject" regarding child witness reliability as "spirited critique" and "would expect emphatic language on both sides"). Edwards acknowledges that the acrimony between the parties derives from "differences regarding community activism," the defendants' belief that he "represents government interests and does not perform objective water testing," and disagreements regarding the "results and methods of Edwards' water testing" as well as his "public statements." ECF No. 9, at 15–16.

---

[23] It appears that Edwards has testified in at least one case regarding the Flint water crisis. The Letter suggests that in March 2018, Edwards testified in defense of Eden Wells and Nick Lyon, both of whom are reportedly charged with involuntary manslaughter "for hiding the deadly Legionnaire's outbreak in Flint." ECF No. 9–1. Edwards does not claim that this statement is false.

60

The parties each appear to operate or contribute to blogs and various social media accounts to advance their respective positions vis-à-vis the Flint water crisis and debate other advocacy-related issues. These same online media are also apparently being used by the parties to critique, ridicule, cast aspersions upon, and question each other's motives and/or intentions. In a series of emails and Facebooks posts to varied (or unspecified audiences), the defendants accuse Edwards of, among other things, (1) "being co-opted by the [s]tate," (2) promulgating an "imperial and colonial version of 'saving' us" by "belittling our knowledge, demands, organizing and mobilization in defense of our health," (3) engaging in conduct that "silences and erases the people who are suffering from the multiple contaminants," (4) "'pimp[ing]' the disaster for personal and professional gain while . . . compound[ing] our suffering by trotting us out when it is convenient" and fits Edwards' "'hero' and 'rescue' story line," and (5) "arrogat[ing] power and credit for [himself] and [his] chosen band that rightly belonged to the people." Id. at 18–22. In response to these and other statements, Edwards and a student apparently published blog posts wherein they attempted to counter some of the accusations levelled against. Indeed, there appears to have been an extensive and acrimonious back-and-forth between the parties via email, text message, Facebook, Twitter, and other social media spanning several years. These exchanges and the statements above reflect a discourse devolved in mudslinging of the sort that is, regrettably, commonplace today.

Edwards' pleadings reveal that the extreme distrust between the parties spilled into the public sphere. In 2017, for example, Edwards states that New York Times Magazine published a profile article about him, in which defendants all made "negative and harmful

statements regarding [him] to a reporter that were included in the article." Id. at 17. The publication of the Letter, and presumably its contents, was also covered in an article published by East Village Magazine. Id. at 12. Further, the Letter itself contains hyperlinks to online newspaper articles and posts from detroitnews.com, michiganradio.org, and theguardian.com, with headlines such as, "Edwards: Flint witness falsified research claims," "Scientific disagreements could affect special prosecutor's case in Flint water crisis," and "Flint lead tainted water . . . safe to use," respectively. Id. at 9–1, at 2. Insofar as the controversy surrounding the Flint water crisis and the disputes between the parties over advocacy-related matters were known to the public, this backdrop is probative as to how a reasonable reader of the Letter, fully aware of the biases and confrontational posture of the parties in relation to one another, would react to and interpret the statements contained in paragraphs 13(a) – 13(i). See Ollman, 750 F.2d at 983 ("It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service.").

With respect to the third Ollman factor—the context of the challenged statements within the writing as a whole—the Letter is replete with emotional and polemical language, rhetorical hyperbole, and unmistakable indicia of partisanship. Indeed, there is absolutely no pretense of objectivity or disinterestedness. The email in which the Letter was attached begins by requesting those to whom it is addressed "tell us where we can file a formal complaint against the behavior, since January 2016," of Marc Edwards, and states that the attached Letter is "our full complaint" expressing some of the signatories' "concerns." ECF No. 9–1, at 1. The Letter is organized around four points numbered accordingly: (1)

"Violation of principle #3 of the Jemez principles for democratic organizing," (2) "Obstruction of Flint's right for self-determination," (3) "Unsubstantiated defamation of Flint residents," and (4) "To our knowledge, there is no one in the scientific community overseeing Mr. Edwards' work or the way he uses his power over powerless residents." Id. at 1–4.

Under the first point, the authors express their frustration with Edwards about a formal complaint he allegedly filed against a Wayne State University professor. The authors claim that the complaint "does nothing to help the residents of Flint move toward recovery," "has caused more strife, stress and drama that we do not need, want or deserve," and was presented by Edwards as the grievances of Flint residents "without speaking to us first or securing our permission to take this action on our behalf." Id. at 1. The authors sarcastically state that the formal complaint filed against this professor, Shawn McElmurry, should have been titled "Marc Edwards v. Whomever He Chooses," and reaffirm that "Flint residents have their own voice and never asked [Edwards] to speak for us . . . ." Id. They then state that Edwards' claims of representing Flint residents is "hollow," and "[t]hose who haven't figured this out yet should ask themselves why it is that Mr. Edwards' only evidence of working with 'the residents' is a tired show of the same group of 2-3 individuals who are embedded with Mr. Edwards and loyal to him." Id.

Under the second point, the authors state, among other things, that the "[r]esidents of Flint object to Mr. Edwards fighting his own petty and vicious fights against anyone and everyone he sees as a challenger or competitor . . . all under the guise of 'protecting' and 'saving' us, or 'defending' science." Id. at 2. They further claim that many residents of Flint

63

are "exhausted" with Edwards' "Hollywood antics – this is not Entertainment Tonight," and are fearful that Edwards' "glib, reckless, and egotistical conduct may hamper the ongoing criminal investigation into the Legionnaires deaths in our city, which we see as the only form of justice we might achieve." Id. Edwards' conduct, the authors claim, creates "additional and totally undeserved worry [that] suddenly adds to the stress and chaos we already feel." Id.

Under the third point, the authors take umbrage with several of Edwards' purported statements concerning bathing habits in Flint and express their disapproval of accusations Edwards allegedly leveled against those they consider allies to their cause in Flint and who provided Flint residents with certain information about bacteria growth on filters. Id. The authors further criticize Edwards' alleged portrayal of them, stating that "we WANT science that addresses our questions, experiences, and needs," and that "[w]hat scares us is Mr. Edwards who uses his position as a scientist to misrepresent us and silence us." Id. 2–3.

Finally, under the fourth point, the authors, among other things, call on Edwards to focus "on our LIVES, our first-hand EXPERIENCES, our NEEDS, and on the fact that we are still suffering." Id. The Letter closes by requesting that "you, key representatives of the scientific and engineering communities," provide "full protection from Mr. Edwards immediately," an "immediate investigation" that puts their "voices at the center," and "a committee that that includes academics, professionals, and Environmental Justice leaders who have expertise in abuses of professional power against poisoned communities like Flint." Id. at 4.

Lastly, there is a definite and palpable current of exasperation throughout the Letter, as evidenced by use of capitalization to underscore words such as NEEDS, LIVES, EXPERIENCES, and statements such as (1) "WE are the ones who have always led and continue to lead the activism on the ground . . . Mr. Edwards' work wouldn't be possible without US," and (2) "Mr. Edwards' choice to initiate drama distracts from the real suffering in Flint and needs to stop NOW." ECF No. 9–1, at 1–4. The emphasis on the first-person tense ("we," "us," "our") and exaggerated rhetoric (e.g., "this is not Entertainment Tonight," "Mr. Edwards v. Whomever He Chooses") put the reader on notice the Letter is an "inherently subjective enterprise." Ollman, 750 F.2d at 988; see McCabe v. Rattiner, 814 F.2d 839, 843 (1st Cir. 1987) ("In the context of public debate over a matter of community concern, first person narrative articles . . . are commonly understood to be attempts to influence th[e] public debate."). The sum effect of the format, tone, and content of the Letter is to make it unmistakably clear that its contents are of a partisan character, and that the statements therein are likely expressing opinions, rather than conveying facts.

The analysis, however, does not end there, for while signaling to readers to expect opinion, context alone does not render all statements automatically non-actionable. It is possible that a particular statement may imply an assertion of objective fact and thus constitute actionable defamation. The court will, as it must, proceed by assessing the allegedly defamatory statements contained in paragraphs 13(a) – 13(i) individually. The court will pay close attention, per the first and second Ollman factors, to whether the authors' choice of words supports or negates any impression that a challenged statement asserts or implies defamatory facts and to the question of verifiability. The latter requirement is

65

especially important, as the Fourth Circuit has recognized that <u>Milkovich</u> placed "primary emphasis . . . on verifiability of the statement." <u>Chapin</u>, 993 F.2d at 1093 (citation omitted). In <u>Ollman</u>, the court explained the significance of verifiability:

> The reason for this inquiry is simple: a reader cannot rationally view an unverifiable statement as conveying actual facts. Lacking a clear method of verification with which to evaluate a statement . . . the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject. [The] . . . obvious potential for quashing or muting First Amendment activity looms large when juries attempt to assess the truth of a statement that admits of no method of verification.

750 F.2d 970, 981–82 (D.C. Cir. 1984). Indeed, "in the setting of litigation, the trier of fact obliged in a defamation action to assess the truth of an unverifiable statement will have considerable difficulty returning a verdict based upon anything but speculation." <u>Id.</u> at 970.

### (1) Paragraphs 13(a) and 13(i)

#### Paragraph 13(a)

Residents of Flint.... Also request that you send representatives to Flint as soon as possible for a meeting with us to hear directly from us about our experiences with Mr. Edwards and our **call for an investigation into Mr. Edwards' conduct and the harm his actions have caused.**

#### Paragraph 13(i)

We are reaching out to you, key representatives of the scientific and engineering communities who keep awarding and rewarding Mr. Edwards for his behavior, because **we need full protection from Mr. Edwards immediately.** We also **need an immediate investigation** that puts OUR voices at the center and demands evidence for all claims made by Mr. Edwards. **We ask for a committee that includes academics, professionals, and Environmental Justice leaders who have expertise in abuses of professional power against poisoned communities like Flint.**

66

Edwards complains that the above paragraphs, which bookend the body of the Letter and both call for investigations, contain factual statements and/or implications, inferences, or insinuations that, inter alia, Edwards is guilty of professional misconduct or other wrongful activity that warrants an investigation into his behavior, and that his professional misconduct has caused and is causing ongoing harm to the residents of Flint, Michigan, and other individuals who need "full protection" from Edwards' "abuses of professional power." ECF No. 9, at 8, 11. He further avers that these statements falsely state or imply that he lacks integrity and is unfit to perform his professional duties when, in fact, he is "not guilty of such misconduct and has not caused harm to the residents of Flint." Id. Finally, Edwards claims that "no individuals need protection from [him], [as he] does not abuse professional power." Id. at 11.

Whether the signatories' feel that they "need full protection" from Edwards is plainly a question and/or expression of opinion. Edwards is, of course, as entitled to his opinion that "no individuals need protection from him" as the authors and/or signatories are to their contrary opinion regarding the same. Further, merely calling for an "investigation," i.e., an inquiry, in the context of an ongoing public controversy, does not, in and of itself, imply a defamatory fact. It "simply provokes public scrutiny of the plaintiff's activities," and "voluntary public figures [like Edwards] must tolerate such examination." See Chapin, 993 F.2d at 1094 ("This question is pointed, and could certainly arouse a reader's suspicion. . . . [I]nquiry itself, however embarrassing or unpleasant to its subject, is not accusation. The language used cannot be tortured to 'make that certain which is in fact uncertain.'"); Ollman, 750 F.2d at 983 ("First Amendment is served . . . by those articles that . . . raise questions

67

and prompt investigation or debate . . . [and] [b]y giving weight on the opinion side of the scale . . . courts provide greater leeway to journalists and other writers and commentators in bringing issues of public importance to the public's attention and scrutiny"). It cannot be the case that calling for an investigation into someone in Edwards' position of authority and influence vis-à-vis the Flint water crisis is ipso facto defamatory.[24]

Edwards' decision to voluntarily "thrust himself into the vortex" of an important and emotionally-fraught public controversy, to engage in advocacy-related work affecting and/or touching on the welfare of Flint residents, and to immerse himself in spirited online exchanges, invited intense scrutiny of his conduct. Gertz, 418 U.S. at 345. Edwards was not a "cloistered scholar" "confined . . . to academic pursuits" who was "suddenly singled out" by the authors. Ollman, 750 F.2d at 1003-04 (Bork, J., concurring). To the contrary, he "entered a political arena in which heated discourse was to be expected and must be expected," and therefore Edwards must "accept the banging and jostling of political debate, in ways that a private person need not . . . ." Id. at 1002, 1004. More importantly, the Flint water crisis is a paradigmatic example of a matter of public concern where the freedom to call for an "investigation" into the activities of those in positions of significant persuasive power and influence is essential.

Furthermore, considering the calls for an "investigation" in their specific context would reinforce in the mind of a reasonable reader that whatever misbehavior is implied by these requests is of a highly subjective character. Immediately preceding the call for an

---

[24] See also Brian v. Richardson, 87 N.Y.2d 46, 53, 660 N.E.2d 1126, 1131 (1995) (holding that an article advocating for a government investigation into purported misuse of software would be understood, in context, "as mere allegations to be investigated rather than as facts").

68

investigation in paragraph 13(a), for example, the signatories "request that you send representatives to Flint as soon as possible for a meeting with us to hear directly from us about our experiences with Mr. Edwards." ECF No. 9–1, at 1. Likewise, in paragraph 13(i), the authors state that "we need an immediate investigation that puts OUR voices at the center and demands evidence for all claims made by Mr. Edwards." Id. at 3. In this context, a reasonable reader would understand that these calls for an "investigation" are based primarily, if not exclusively, on the signatories' "experiences" and/or subjective sense that Edwards has wronged them or conducted himself in a manner which, in their opinion, is detrimental to the cause of Flint residents. They are not accusing Edwards of violating any criminal statute or other technical or commonly-understood professional or occupational standard. Cf. Tronfeld v. Nationwide Mut. Ins. Co., 272 Va. 709, 714, 636 S.E.2d 447, 450 (2006) (accusing an attorney of engaging in conduct that constituted larceny by trick or obtaining money by false pretenses was defamatory).

      With respect to the statements concerning (1) "abuses of professional power" and (2) the "harm" Edwards' actions allegedly caused, both statements are expressions of opinion and/or unverifiable by a "core of objective evidence." Milkovich, 497 U.S. at 21. Indeed, because the words themselves are sweeping and non-specific, they are likely to be discounted accordingly. See Lauderback v. Am. Broadcasting Cos., 741 F.2d 193, 197 (8th Cir. 1984), cert. denied, 469 U.S. 1190 (1985) ("While allegations of specific criminal conduct generally cannot be protected as opinion, broad brush-stroked references to unethical conduct, even using terms normally understood to impute specific criminal acts, may be understood by the reasonable viewer as opinion."). Instead of referring to specific "abuses" or "harm," the

69

authors are opining on conduct spanning several years ("since January 2016"), employing terminology, such as "professional power" and "harm," that are "indefinite and ambiguous" rather than carrying a "precise core of meaning for which consensus of understanding exists." Ollman, 750 F.2d at 979, n.16; cf. Spirito v. Peninsula Airport Comm'n, No. 4:18CV58, 2018 WL 6075489, at *8 (E.D. Va. Nov. 21, 2018) (defendants "did not make vague observations about [p]laintiff's conduct; they remarked on a single incident," and commentary that "one occasion of shredding was 'weird' or 'out of hand,' given the ongoing investigation, carries the necessary implication that such [document] shredding is wrongful – a factual connotation that is provably true or false").

Finally, these accusations, like many others scattered throughout the Letter, simply are not objectively capable of proof or disproof. In Milkovich, the Supreme Court, addressing the issue of verifiability, held that whether the petitioner, Michael Milkovich, committed perjury, as reported by respondent Lorain Journal Company, was verifiable because it could be determined by "a core of objective evidence." Milkovich, 497 U.S. at 21. The Court held that "[u]nlike a subjective assertion the averred defamatory language [was] an articulation of an objectively verifiable event," as determining whether Milkovich "lied in this instance can be made . . . by comparing, inter alia, petitioner's testimony before the OHSAA board with his subsequent testimony before the trial court." Id. In other words, in Milkovich, the court could compare two sets of sworn testimony by the petitioner to make an objective determination of perjury. See also Unelko Corp. v. Rooney, 912 F.2d 1049, 1053 n.2 (9th Cir. 1990), cert. denied, 499 U.S. 961 (1991) (holding that statement that a rain repellant product "didn't work" rests on "a core of objective evidence" because a product

70

can be tested objectively to determine whether it performs the functions that it claims to perform—rain repellent either is or is not invisible on one's windshield, it does or does not increase all-around visibility, and rain either does or does not disperse on contact).

While <u>Milkovich</u> does not specify the quantity or quality of evidence necessary to determine whether an allegedly defamatory statement is "verifiable," amorphous claims of "abuses of professional power" and non-specific accusations of causing "harm" are more analogous to "broad, unfocused, wholly subjective" comments than "factual expressions . . . permit[ing] liability to be imposed." <u>Lauderback</u>, 741 F.2d at 196–97, n.6 (citation omitted); <u>see</u> <u>Ollman</u>, 479 F. Supp. at 294 (suggesting that "loosely definable, variously interpretable statements . . . made inextricably in the context of political, social, or philosophical debate" are opinions, while statements "imputing objective reality," such as "Jones had ten drinks at his office party and sideswiped two vehicles on his way home," are assertions of fact). The court cannot imagine any method akin to that articulated in <u>Milkovich</u> whereby a jury might verify either of the complained-of statements without asking it to engage in speculation of the kind cautioned against in <u>Ollman</u>. <u>See, e.g.</u>, <u>Phantom Touring, Inc. v. Affiliated Publ'ns</u>, 953 F.2d 724, 728 (1st Cir. 1992) (holding that a critic's description of a theater production as "a rip-off, a fraud, a scandal, a snake-oil job" was non-actionable because "we . . . can imagine no objective evidence to disprove it"). Indeed, because the vaguely alleged "harm," for example, is not delimited in any way, either by type (e.g., financial, emotional, etc.) or by reference to some objectively verifiable event, it is unverifiable.

### (2) Paragraph 13(b)

> This is **dishonest, paternalistic and exploitative** and, we fear, used by Mr. Edwards to **build his own professional and financial power** .

. . Far too many residents are exhausted **from Mr. Edwards bullying** .
. . Mr. Edwards is **using our crisis and suffering for entertainment,
intrigue, exhibitionism, and personal power** that might attract the
media and outside readers but are completely inappropriate for the
circumstances.

Edwards complains that statements in paragraph 13(b) are defamatory because they

contain factual statements and/or implications, inferences, or insinuations that he is guilty of

professional misconduct or other wrongful activity, including exploitation for private gain,

bullying, and using the suffering of others to increase his personal power. ECF No. 9, at 8–9.

Edwards further avers that the statements falsely state or imply that he lacks integrity and is

unfit to perform his professional duties. Id. at 9.

While these statements are undoubtedly irksome from Edwards' perspective, they

plainly qualify as constitutionally protected opinion. Tellingly, Edwards elides (through

ellipses) crucial context for assessing the defamatory potential of statements contained in

paragraph 13(b). Immediately preceding the excerpt above is the following sentence:

"[r]esidents of Flint object to Mr. Edwards fighting his own petty and vicious fights against

anyone and everyone he sees as a challenger or competitor, and against anyone and everyone

Flint residents turn to for help other than himself, all under the guise of 'protecting' and

'saving' us, or 'defending' science." ECF No. 9–1, at 2. The string of adjectives which

Edwards alleges as defamatory must be viewed as commenting upon conduct described, and

within the context of the exasperated language presented, in the preceding sentence. See

Moldea v. N.Y. Times Co., 15 F.3d 1137, 1144–45 (D.C. Cir. 1994) (holding that "[b]ecause

the reader understands that such supported opinions represent the writer's interpretation of

the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.").

Virginia law reveals many decisions in which Virginia courts have rejected claims alleging unflattering, but nonetheless protected, expressions of the sort contained in paragraph 13(b). Indeed, many of these decisions hold that "opinions about a plaintiff's character or conduct cannot form the basis for a defamation claim," especially where the challenged "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint," Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003), or which a reasonable person "could only regard as a relative statement of opinion ground upon the speaker's obvious bias." Chaves v. Johnson, 230 Va. 112, 119, 335 S.E.2d 97, 101 (1985); see Hanks v. WAVY Broad., LLC, No. 2:11CV439, 2012 WL 405065, at *10 (E.D. Va. Feb. 8, 2012) (collecting cases) (holding that description of tax preparers as "unscrupulous" not defamatory); see, e.g., Taylor v. CNA Corp., 1:10CV181, 2010 WL 3430911, at *15 (E.D. Va. Aug. 27, 2010) (finding coworkers' statements that plaintiff was "intimidating" and "bullying" not capable of defamation); Marroquin v. Exxon Mobil Corp., 08CV391, 2009 WL 1429455, at *9 (E.D. Va. May 27, 2009) (finding defendant's characterization of plaintiff's conduct as "very bad," "inappropriate," and "improper" were "an opinion of the scope and magnitude of [p]laintiff's wrongdoing that cannot be proven false").[25]

---

[25] Unsurprisingly, courts outside the Fourth Circuit also routinely conclude that statements similar to those in paragraph 13(b) are non-actionable. See, e.g., Gregory v. McDonnell Douglas Corp., 17 Cal. 3d 596, 131 Cal. Rptr. 641 (1976) (sustaining demurrer because accusing plaintiff of "seeking personal gain and political prestige rather [than serving] the best interests of the members they were supposed to represent" was "not properly the subject of a libel action").

73

Here, consistent with the above precedent and a common-sense reading of the statements contained in paragraph 13(b), the court concludes that the characterization of Edwards' conduct as "dishonest, paternalistic, and exploitative"[26] belongs squarely in the category of constitutionally protected speech. No reasonable reader would interpret the use of these adjectives as representing anything other than the subjective views of the authors critiquing conduct described in the sentence immediately preceding the one at issue. The characterization is clearly relative in nature and perspective-dependent. Indeed, behavior that might qualify as "exploitative" or "paternalistic" to one person, although being perfectly acceptable to another, demonstrates that evaluative assessments of this sort involving "hopelessly imprecise" terms for which there is no well-accepted, agreed-upon meaning are within the range of non-actionable opinion.[27] Ollman, 750 F.2d at 979, 987 (asking whether the statement has "a precise core of meaning for which consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous," as "[r]eaders are . . . considerably less likely to infer facts" from the latter).

Further, the statement that Flint residents "are exhausted from Mr. Edwards bullying" is similarly perspective-dependent—a statement that can be shown to be true, but only in the context of a particular viewpoint—and therefore cannot be defamatory. Indeed, a charge of bullying is an intrinsically relative statement, for as the defendants state, "what one person may perceive as bullying, another may describe as assertiveness." ECF No. 31, at 10;

---

[26] The court addresses imputations of dishonesty in its extended discussion of statements contained in paragraph 13(d). That analysis applies with equal force to the use of "dishonest" in paragraph 13(b).

[27] See Standing Comm. on Discipline v. Yagman, 55 F.3d 1430, 1440 (9th Cir. 1995) (finding that attorney's statement describing a district court judge as "dishonest," "in [the] context" of "a string of colorful adjectives [attorney] used to convey the low esteem in which he held [the judge]" conveyed "nothing more substantive than [attorney's] contempt for [the judge]," and rendered the allegation merely a statement of "rhetorical hyperbole").

74

see Hupp v. Sasser, 200 W. Va. 791, 797–99, 490 S.E.2d 880, 886–88 (1997) (describing another as a "bully" is "devoid of a provably false assertion of fact" because "[t]he threshold of what constitutes bullyism to one would necessarily not be the same for another"); see also Cummins v. Suntrust Capital Markets, Inc., 649 F. Supp. 2d 224, 244 (S.D.N.Y. 2009), aff'd, 416 F. App'x 101 (2d Cir. 2011) (collecting cases) (holding that characterization of the plaintiff's conduct as "self-interested, dishonest, and unethical" was a non-actionable expression of opinion since whether the plaintiff's conduct was self-interested, etc. was a question of characterization and as such, could not be proven true or untrue).

Here too, the immediate context of these statements would also signal their subjective basis and character. In addition to the statement criticizing Edwards for "fighting his own petty and vicious fights against anyone and everyone he sees a challenger or competitor . . . ," the first clause excerpted by Edwards in paragraph 13(b) is followed by a claim that his conduct "violates the most basic right that we have for self-determination." ECF No. 9–1, at 2. The second clause in paragraph 13(b) concerning bullying is immediately followed by the following statement: "his claims to be the 'humanitarian' who so 'cares' for the people, and his Hollywood antics – this is not Entertainment Tonight." Id. Notably, Edwards does not assert that either of these statements are themselves defamatory. Nor could he. These statements are vituperative expressions of opinion, "heavily laden with emotional rhetoric and moral outrage," Milkovich, 497 U.S. at 32, as well as hyperbolic language (e.g., "entertainment, intrigue, exhibitionism, and personal power"). ECF No. 9-1, at 2. In this context, a reasonable reader would recognize the opinionative nature of the statements alleged as defamatory. The irreverent, overwrought word choice would surely

75

give away their subjective character, as well as negate any impression that they assert facts verifiable in a defamation action.

### (3) Paragraph 13(c)

> Mr. Edwards' **portrayal of Flint residents as dumb, dirty and vulnerable** to being misled by anyone other than himself started in early 2016, is ongoing, and is misguided and offensive...

Edwards complains that the above statement is factually false because he has never "stated" that Flint residents are "dumb, dirty and vulnerable to being misled," or done anything to portray them as such. ECF No. 9, at 9. He further claims that this statement suggests that he lacks integrity, is unfit to perform his professional duties, harms his reputation, and lowers the esteem with which he is regarded in his professional community because he "belittles, insults, and treats citizens with disrespect and acted callously in a community where he works as a scientist and advocate." Id.

It should be noted at that outset that the challenged statement is not accusing Edwards of having actually "stated" that Flint residents are "dumb, dirty, and vulnerable to being misled." The plain language of the text indicates that the statement relates not to a direct quotation, but rather, to an alleged "portrayal," one which the authors consider, from their perspective, "misguided and offensive."[28] Moreover, because the authors disclose the underlying basis for their opinion regarding this alleged portrayal (discussed below), this statement cannot support a claim for defamation. See Chapin, 993 F.2d at 1093.

---

[28] Edwards claims that that Mays "first created and employed this 'dumb and dirty' catchphrase when she attacked [him] in the New York Times Magazine" article published in 2016.

The allegedly defamatory statement excerpted in paragraph 13(c) appears in the Letter as paragraph 3. This umbrella paragraph, titled, "Unsubstantiated defamation of Flint residents," is supported by three subparagraphs, numbered 3(a) – 3(c). In these three subparagraphs, the authors set forth and/or articulate the basis supporting their claim that Edwards has portrayed as "dumb, dirty, and vulnerable to being misled," and explained why they consider this portrayal "misguided and offensive." ECF No. 9–1, at 2. In paragraph 3(a) of the Letter, the authors state, among other things, that "WE, Flint residents, are the ones who discovered our water's contamination months before we brought Mr. Edwards in our city . . . [and] despite Mr. Edwards' claim to the contrary, WE are the ones who have always led and continue to lead the activism on the ground. In reality, Mr. Edwards' work wouldn't be possible without US." Id. In subparagraph 3(b), analyzed separately below, the authors further contend that "[c]ontrary to Edwards' claims, Flint residents were never told that shigella was in our tap water and, as a whole, never stopped using proper hygiene from fear of the water. . . . We (of course) bathe, which is why we have been saying that the problems without water are not over. It is [because] we bathe that we experience rashes, breathing problems in the shower and more." Id. Lastly, in subparagraph 3(c), parts of which are also analyzed separately below, the authors rebuke Edwards for "erroneously accus[ing]" others "of scaring residents out of bathing." Id. at 3.

This same subparagraph provides a hyperlink connecting readers to an article dated May 31, 2016 published by The Guardian titled "Scientists say Flint's water safe enough for hand-washing and showering," The article states, in relevant part:

> Marc Edwards, a Virginia Tech engineering professor whose
> testing last summer confirmed the lead contamination of Flint's

77

water, said sampling in recent months has found that lead levels are steadily declining, although they remain too high for people to drink from the tap without a filter. Also trending downward are bacteria that can cause legionnaires' disease, while byproducts from disinfectant chemicals are at normal levels, he and other specialists said.

"We're seeing some very, very encouraging results," Edwards said at a news conference in Flint, adding that he was "pretty hopeful" the water would meet federal standards for lead content within the next six months.

The upbeat assessment contrasted with a grim portrayal by Ruffalo and Water Defense, an organization he founded, which said in February its testing had turned up lead and dangerous chemicals in sinks, tubs, showers and water heaters. Ruffalo, who starred in the Oscar-winning film Spotlight, has continued sounding the alarm, while Edwards has accused him of fearmongering based on flawed testing that has frightened some people into forgoing basic hygiene.

"Many parents were deciding not to allow their children to take baths or shower or even wash their hands, they were so afraid," Edwards said in a phone interview.

Edwards was hired by the city in January to oversee water testing, his work funded through private donations.

Despite his sharp criticism of state and federal agencies' performance, he said on Tuesday the situation had improved, with phosphate treatments coating pipes and residents heeding pleas to flush more water through the system, washing away lead-tainted rust.

Edwards acknowledged many in Flint "have been through hell" and are understandably distrustful of authority, particularly those suffering from skin rashes and other symptoms they blame on the water.

But he said residents should question the credibility of Ruffalo's group.

"They're not scientists, nor are they familiar with how to sample water," Edwards told the AP.

ECF No. 27–1 (Ex. A). [29]

Irrespective of the truth of the information contained in The Guardian article, it cannot be argued that the authors failed to disclose the factual basis for feeling that Edwards portrayed them as "dumb, dirty, and vulnerable." The statement in question is clearly based on information in paragraphs 3(a) − 3(c) of the Letter and information pertaining to Flint residents' bathing habits and vulnerability contained in The Guardian article. This disclosure permits readers to draw their own conclusions about whether this characterization is overstated or unfair. See Agora, Inc. v. Axxess, Inc., 90 F. Supp. 2d 697, 704 (D. Md. 2000), aff'd, 11 F. App'x 99 (4th Cir. 2001) ("The principle that opinions based on disclosed facts are protected is well established.").

### (4) Paragraph 13(d)

> Contrary to Mr. Edwards' claims, Flint residents were never told that shigella was in our tap water and, as a whole, never stopped using proper hygiene from fear of the water. The allegation that FACHEP announced that they found shigella in Flint water **is a lie**. The allegation that WE caused our own shigella outbreak because we stopped bathing out of fear of the water, **is also a lie**.

Edwards complains that paragraph 13(d) contains factual statements and/or implications, inferences, or insinuations suggesting that he lacks integrity and is unfit to perform his professional duties because he has (1) purposefully misrepresented and/or manipulated scientific data, (2) accused Flint residents of not bathing, (3) stated "that

---

[29] The court takes judicial notice only of The Guardian article. Unlike the newspaper articles referenced in Section III.A for which the court declined to take judicial notice, The Guardian article was hyperlinked in the Letter. When a court takes judicial notice of publications like websites and newspaper articles, the court merely notices what was in the public realm at the time, not whether the contents of those articles were in fact true. See Von Saher v. Norton Simon Museum of Art, 592 F.3d 954, 960 (9th Cir. 2009); accord Premier Growth Fund v. Alliance Capital Mgmt., 435 F.3d 396, 401 n.15 (3d Cir. 2006).

Case 7:18-cv-00378-MFU   Document 32   Filed 03/20/19   Page 79 of 115   Pageid#: 563

FACHEP announced that they found shigella in Flint water," and (4) is a liar. He claims

generally that "none of these statements are true." ECF No. 9, at 9–10. More specifically, he

states that he (1) never "misrepresented or manipulated scientific data," that he (2) "never

told lies regarding shigella or altered bathing habits," and (3) always referred to, or spoke

consistently with, data or reports from the Center for Disease Control ("CDC") and other

authorities when discussing bathing and shigella, and (4) otherwise conducted himself in

accordance with the professional duties and standards expected of those working in his

vocation. Id.

The two sentences alleged as defamatory in paragraph 13(d) come closer to asserting

actual facts. Edwards argument vis-à-vis paragraph 13(d) is twofold. Edwards first appears to

deny that he actually "stated" and/or made either of the claims the authors' later call lies. In

other words, Edwards appears to claim that these claims were falsely attributed to him.

Edwards then asserts that the authors' use of the term "lie" implies that he "lacks integrity

and is unfit to perform his professional duties," and is a "liar." ECF No. 9, at 9.

## A.

Whether Edwards ever "stated" and/or made either of the aforementioned claims

attributed to him in paragraph 13(d) is, theoretically, verifiable. In Tharpe v. Saunders, the

Supreme Court of Virginia endorsed the Supreme Court's holding in Masson v. New York

Magazine, 501 U.S. 496, 511 (1991), that false attribution (of a quotation) "may result in

injury to reputation because the manner of expression or even the fact that the statement

was made indicates a negative personal trait or an attitude the speaker does not hold." 285

Va. 476, 737 S.E.2d 890, 893 (2013). Virginia's highest court held that Tharpe, the plaintiff

80

contractor, could sue a competitor for defamation for allegedly telling one of the Tharpe's clients that Tharpe told the competitor that he was going to "screw," i.e., defraud, the client just like he had another client. Id. at 285 Va. at 476, 737 S.E.2d at 891–92. (citing Kerby v. Hal Roach Studios, Inc., 53 Cal.App.2d 207, 127 P.2d 577, 581 (1942) (defamation may be accomplished by falsely putting words into the mouth of the person defamed and imputing to such person a willingness to use them "where the mere fact of having uttered or used the words" would produce harm to plaintiff's reputation). To illustrate the point further, the Supreme Court of Virginia went on to hold that if it was alleged instead that the defendant said, "Tharpe is going to screw the [government agency] like he did [in the previous project]," one might argue that such a statement was an expression of opinion or viewpoint dependent. Id. Here, as in Tharpe, Edwards appears to allege that the authors made a false statement of fact – that he "stated" and/or claimed that (1) Flint residents were told that shigella was in their tap water or (2) that they "caused" the shigella outbreak by not bathing on account of their fear of the water.

With respect to the first claim Edwards appears to assert was falsely attributed him, the court credits Edwards' claim of falsity. The analysis, however, does end there, for to be actionable in Virginia, the attribution must not only be false, but also defamatory. In other words, only statements that generate a certain degree of "sting" to one's reputation will support a cause of action. Schaecher, 290 Va. at 92, 772 S.E.2d at 594.

The Supreme Court of Virginia, characterizing the level of harm to one's reputation required to state a claim for defamation, has stated that defamatory language is language which "tends to injure one's reputation in the common estimation of mankind, to throw

81

contumely, shame, or disgrace upon him, or . . . tends to hold him up to scorn, ridicule, or contempt, or . . . is calculated to render him infamous, odious, or ridiculous." Schaecher, 290 Va. at 91–92, 772 S.E.2d at 594 (quoting Moss v. Harwood, 102 Va. 386, 392, 46 S.E. 385 (1904)). "[L]anguage that is insulting, offensive, or otherwise inappropriate, but constitutes no more than 'rhetorical hyperbole'" is not defamatory. Yeagle, 255 Va. at 296, 497 S.E.2d at 137.

Edwards fails to explain how the first allegedly false attribution—that Flint residents were told or that there was an announcement that shigella was in their tap water—is defamatory. Nor is the court able to discern the requisite "sting." Indeed, the statement is facially inoffensive and Edwards has failed to identify what, if any, defamatory implications arise from attributing this claim to him. In short, Edwards has not established any way in which the first allegedly false attribution is capable of defamatory meaning.

With respect to the second claim Edwards avers was falsely attributed to him— that Flint residents "caused" the shigella outbreak by changing their bathing habits due to fear of the water—the court finds that Edwards has (1) failed to adequately plead falsity, and that the (2) attribution is substantially true. When falsity is an element of a state law defamation claim, as it is in Virginia, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false. See Tannerite Sports, LLC v. NBC Universal News Grp., 864 F.3d 236, 247–48 (2d Cir. 2017).

Normally, on a motion to dismiss a defamation suit on the basis that a statement is non-actionable, the court must "credit the plaintiff's allegation of the factual falsity of a statement" unless the allegation of falsity is vague and conclusory or contradicts an external

82

document incorporated into the complaint. Dangerfield v. WAVY Broad., LLC, 228 F. Supp. 3d 696, 702 (E.D. Va. 2017) (citing Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092–93 (4th Cir. 1993)). Further, courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" at the motion to dismiss stage. Hebbeler v. First Mariner Bank, No. CV ELH-17-3641, 2018 WL 3818855, at *4 (D. Md. Aug. 10, 2018) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss . . . ." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc); accord Pressley v. Tupperware Long Term Disability Plan, 553 F.3d 334, 336 (4th Cir. 2009); see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency, 745 F.3d 131, 148 (4th Cir. 2014).

Here, Edwards' falsity averment vis-à-vis the second, allegedly false attribution is not only (1) vague and ambiguous, but it is (2) contradicted by at least one document properly before the court, the authenticity of which is undisputed. In his pleadings, Edwards first appears to outright deny that he ever "accused Flint resident [sic] of not bathing," stating "none of these statements is true." ECF No. 9, at 9. In the same breath, Edwards qualifies this denial, stating that he "never told lies regarding shigella or altered bathing habits, and . . . always referred to, or spoke consistently with, data and/or reports from the Center for Disease Control and other authorities when discussing bathing and shigella . . . ." Id. With respect to false attribution issue specifically, the question is not whether Edwards "never told lies regarding shigella or altered bathing habits," but whether he claimed, as the authors allege, that residents "caused" the shigella outbreak because they "stopped bathing out of

83

fear of the water." ECF No. 9–1, at 2. It is, of course, possible that Edwards "never told lies" regarding "shigella or altered bathing habits," but nevertheless made the allegedly false claim attributed to him.

In his opposition to the defendants' motion to dismiss, Edwards further equivocates on the issue of whether he claimed that Flint residents altered their bathing habits, and whether these altered habits "caused" the shigella outbreak. Indeed, rather than distance himself from the claim falsely attributed to him, Edwards states his intention to "introduce at trial a CDC PowerPoint presentation explicitly stating altered bathing habits contributed to Flint's shigella outbreak." ECF No. 21, at 24. Why would Edwards claim to have never asserted that which he also plans to introduce evidence to prove? Insofar as Edwards' cause of action for defamation in paragraph 13(d) rests on false attribution of the claim that Flint residents "caused" the shigella outbreak by changing their bathing habits, falsity has not been unambiguously pled. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1105 (10th Cir. 2017) (citing Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 188 (2d Cir. 2000)).

Furthermore, Exhibit 2 of the defendants' motion to dismiss, which the court earlier concluded was incorporated by reference into Edwards' pleadings, indicates that the above attribution to Edwards is substantially true. Though affirmative defenses such as substantial truth are, as previously noted, generally adjudicated at the summary judgment stage rather than on a motion to dismiss, this case presents one of those "rare circumstances" where facts sufficient to rule on an affirmative defense are alleged in the complaint. See Goulmamine v. CVS Pharmacy, Inc., 138 F. Supp. 3d 652, 664 (E.D. Va. 2015) (holding that

84

a court may reach the merits of an affirmative defense at the motion to dismiss stage when "all facts necessary to the affirmative defense clearly appear on the face of the complaint"). The transcript of Edwards' remarks (Exhibit 2) at Swarthmore College contradict his equivocal allegation of falsity as to the second allegedly false attribution. Under the "exhibit-prevails rule," "in the event of [a] conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Fayetteville Inv'rs v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). This appears to be true even when the exhibit is incorporated by reference into the plaintiff's complaint but ultimately attached by the defendant. See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). Indeed, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." Id. at 167.

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." Goines, 822 F.3d at 167 (citing N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend, 163 F.3d 449, 455 (7th Cir. 1998)). "[W]here the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." Id. "For example, if a prisoner attaches an unfavorable decision from a prison tribunal to show that he has exhausted his administrative remedies, he does not thereby adopt the factual findings of that unfavorable decision." Id. (citing Carroll v. Yates, 362 F.3d 984, 986 (7th Cir. 2004) (rejecting as "fantastic" the

argument that "all facts contained in any attachments to a complaint are automatically deemed facts alleged as part of the complaint")). Therefore, before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document. Id. (citing N. Ind. Gun & Outdoor, 163 F.3d at 455 (before treating contents of attached document as true, courts should "consider . . . who authored the document[ ], and the reliability of the document[ ]")).

Here, the court finds that it may consider Exhibit 2 for its truth, and credit the factual content of the document over conflicting allegations in Edwards' Amended Complaint. Edwards explicitly relies in part on the transcript of his remarks (Exhibit 2) in pleading actual malice vis-à-vis the authors' use of the use "tribal" in paragraph 13(h). See ECF No. 9, at 9 (stating that defendants "acted with actual malice each time they stated that Edwards called Flint residents 'tribal,' because . . . the word 'tribal' never appears in the transcript of Edwards' presentation . . ."). Moreover, the transcript is not the sort of "unilateral" document submitted by a defendant that the Fourth Circuit has cautioned against considering for its truth, as it was not "prepared by or for" the defendants, and therefore is unlikely to "reflect the defendant[s'] version of events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." Goines, 822 F.3d at 168; see also Bell v. Landress, 708 F. App'x 138, 139 (4th Cir. 2018); Jones v. Cincinnati, 521 F.3d 555, 561 (6th Cir. 2008). To the contrary, Exhibit 2 is a transcript of Edwards' own remarks, prepared presumably by a third party and evidently intended to contain an exact transcription of Edwards' own words. Cf. Goines, 822 F.3d at 168–69 (incident report

prepared and submitted by officer-defendants should have been read as representing the officers' view of events rather than representing true facts).

In light of the fact that a hyperlink to the transcript was included in two versions of the Letter attached to Edwards' own pleadings, and because he relied upon the transcript for its truth in alleging actual malice, Edwards was both on notice of the factual contents of the transcript and is presumed to have "adopted as true the contents of the document." Goines, 822 F.3d at 166–67. In accordance with the "exhibit-prevails rule," the transcript (Exhibit 2) may be relied on for its truth to the detriment of any contrary allegations in Edwards' pleadings.

The lecture that is the subject of the audio transcript (Exhibit 2) is titled "Truth-Seeking in the Age of Tribalism," and dated February 20, 2018. The transcript, in relevant part, attributes the following remarks to Edwards: (1) "[t]he other sort of thing that happened after the emergency was declared and everyone was rolling up their sleeves and trying to work on this problem, all these people came and tried to help"; (2) "[t]hey came into town, and it's very clear from their first [YouTube] video, they had one intention, and one intention only, which was to claim that the water in Flint was not safe for bathing or showering"; (3) "there are reasons that we take baths and showers, basic public hygiene . . . [s]o important to public health, prevents horrible, horrible diseases . . . [like] shigella, which is spread by fecal contact hand to hand"; (4) "What happened in Flint, after [a celebrity-affiliated] non-profit came to town and started scaring people about the supposed dangerous bathing and showing? Flint was about to experience one of the worst shigella outbreaks in their history . . ."; (5) "[Flint] moms and dads started changing their children's bathing

87

habits. Everyone, many people in Flint did this . . . studies showed 80% of Flint residents changed their bathing habits, including 75% showered less frequently, 70% were taking shorter showers"; (6) ". . . this shigella curve wasn't known at the time." ECF No. 13–3, at 10–12. These statements indicate that the "substance, the gist, the sting" of the second attribution at issue in paragraph 13(d) is justifiable, and as such, cannot support a claim for defamation. Jordan, 269 Va. at 576, 612 S.E.2d at 207, 210; see Biospherics, 151 F.3d at 185 (4th Cir. 1998) (holding that "[a] statement 'is not considered false' and thus actionable "unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced").

## B.

In addition to appearing to assert that the above "claims" were falsely attributed to him, Edwards avers the authors' labelling those claims "lies" is tantamount to (1) accusing him of being a "liar" and of (2) "misrepresent[ing] or manipulat[ing] scientific data." ECF No. 9, at 9. The court finds no basis supporting the latter implication.[30] Further, numerous considerations militate in favor of concluding that the use of the term "lie" in the second and third sentences of paragraph 13(d) constitutes non-actionable rhetorical hyperbole. See Schnare v. Ziessow, 104 F. App'x 847, 851 (4th Cir. 2004).

The universe of defamation cases involving accusations of lying and/or the familiar epithet of "liar" is expansive and singularly lacking in consistency. What is clear, however, is that context is frequently dispositive as to whether imputing dishonesty is actionable or

---

[30] This alleged implication stretches the plain language of the challenged statements to the breaking point. Edwards fails to explain how any of the statements in paragraph 13(d) would support such an implication that clearly rises above the language of the statements themselves.

88

qualifies as non-actionable opinion or hyperbole. In his treatise on defamation, Judge Robert
D. Sack explained:

> The terms 'lie' and 'liar' are frequently used to characterize
> statements with which the speaker vehemently disagrees. If in
> context the words mean that the defendant disapproves, it is a
> protected epithet. If it literally implies that the plaintiff made a
> specific assertion or series of assertions knowing them to be
> false, it may be actionable.

Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2.4.7 at 2-48-2-
49 (4th ed. 2010). In the context of analogous public debates and controversies, many
federal courts, including several in the Fourth Circuit, have found that accusations of lying,
characterizations of others as liars, and other imputations of dishonesty fall into the first
category of non-actionable statements construable only as expressions of opinion.

In Schnare v. Ziessow, 104 F. App'x 847, 852 (4th Cir. 2004), for example, a show
dog breeder brought an action against the author of a three-part magazine article and the
magazine itself for defamation. Ziessow, the author of the article in question, and the
plaintiff, were rival breeders who had "positioned themselves on opposite sides of the
Labrador breed controversy" described below. Id. at 848. In the three-part article, Ziessow
made statements about the plaintiff related to litigation arising from the revision of Labrador
breed standards. Id. Ziessow was among the proponents of the revised standards that
plaintiff, along with others, opposed. Id. In the first installment of the article, Ziessow states
that "[t]he intent of this communication is to answer the half-truths, innuendoes and
outright lies perpetrated by certain parties to the suit, and their fellow travelers, to bemuch
[sic] the reputation and good name of some officers and directors, and to tell the true story."
Id. Ziessow concludes the first installment of the article by stating, "[i]t is a sad commentary

89

that a member club's reputation and loyalty of over fifty years could be questioned on the basis of falsehoods, half-truths, and fabricated charges instigated by a self-promoting patriarch and his disciples." Id. at 849. The second installment criticized an affidavit submitted by the plaintiff, stating, "I looked up the meaning of 'affidavit' [in a dictionary] . . . . It says nothing about nor does it include fabrications, distortions, half-truth, innuendo or hearsay . . . [r]ather it should be a statement of facts." Id. Ziessow then states that he will "not attempt to repute [sic] or rectify all misstatements of fact, untruths or distortions contained in the affidavit," but rather will "respond to those believe [sic] most harmful . . . ." Id. He then proceeds to quote various statements from the affidavit and challenge them factually. Id. at 850. Lastly, in the third installment, Ziessow states that "the affidavit contains more than enough lies, fabrications and inaccuracies to cast a serious doubt on the value of the entire document." Id. The plaintiff asserted that Ziessow's article is libelous because it accuses him of perjury during litigation related to revising the breed standard. Id.

In affirming the district court's grant of the defendants' motion to dismiss, the Fourth Circuit stated that notwithstanding the admonition from Milkovich that there is no wholesale "exemption [from liability] from anything that might be labelled opinion," in determining "whether a statement can be reasonably interpreted as stating actual facts about an individual, we look to the circumstances in which the statement is made" and "whether a reasonable reader would construe them as seriously asserting that [plaintiff] committed the crime of perjury." Id. at 851. The Fourth Circuit noted that although "Ziessow readily uses labels such as 'lie,' 'fabrication,' and 'falsehood,'" the "defamatory capability of these terms cannot be determined on a per se basis." Id. Indeed, "[r]eading the statements from

90

[plaintiff's] complaint in context, we conclude that each one is properly understood as either opinion or hyperbole." Id. The Fourth Circuit noted that many of the statements in question, "which on their face are accusations of lying, are actually vigorous and angry expressions of disagreement." Id. In regard to the characterization of the plaintiff's affidavit as "some 60 pages of fact and fiction, innuendo, half-truths, exaggerations and fabrications," the Fourth Circuit stated that the "context of Ziessow's article, with its snide tone, stern quotations, and responsive posture, alert the reader to the hyperbolic nature of the statements" directed toward an "adversary in the controversy about revising the breed standard." Id. at 852. The Fourth Circuit concluded that the complained-of statements "belong[ ] to the language of controversy rather than to the language of defamation[,]" and as such, are not defamatory. Id. at 853 (quoting Dilworth v. Dudley, 75 F.3d 307, 310 (7th Cir. 1996)).

Arthur v. Offit, No. CIV.A. 01:09-CV-1398, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010), concerned a defamation claim arising out of a 2009 Wired magazine article in which the defendants quoted Dr. Offit, also a named defendant and coinventor of the rotavirus vaccine, as saying of the plaintiff, an opponent of mandatory childhood vaccination: "[s]he lies." Id. at *2–3. The Wired article was a profile of Offit, a "leading national advocate for mandatory vaccination," and was "placed in the larger context of the public debate over systematic vaccination of children," including Offit's "advocacy in favor of [a] vaccine protocol" and opponents' often "sharp criticism" of his position on this issue, "as well as of him personally." Id. at *1.

In addition to discussing the merits of the vaccination issue, the article described "harsh personal attacks" against Offit, and how he was "physically threatened by critics" and was "the subject of a hostile website," as well as the main target of a "grassroots movement" opposing mandatory vaccination and "claiming that vaccines cause autism and/or otherwise injure children." Id. at *2. The article portrays the plaintiff, who at the time was the acting president of the National Vaccine Information Center ("NVIC"), as the "anti-vaccine movement's brain." Id. In response to plaintiff's positions, the Wired article quotes Offit as saying that "'Kaflooey theories' make him crazy" and that the plaintiff "makes him particularly nuts as in 'You want to scream'" because "[s]he lies." Id. at *3. In her complaint, the plaintiff asserted that the statement, "she lies," was defamatory and that the defendants committed defamation per se, causing her to appear "odious, infamous, and ridiculous." Id.

In dismissing the case, the district court made several observations germane to the instant action. The court first noted that because the vaccine controversy is an important matter of public concern, "the constitutional and common law protections . . . are at their zenith." Id. at *3–4. The court further observed that prior to the "she lies" quote, Offit had stated that his opponents in the vaccination debate made him "want to scream" and described their views as "Kaflooey theories." Id. This, the court found, was "precisely the kind of 'loose, figurative' language that tends to negate[ ] any impression that the speaker is asserting actual facts." Id. at *5. In this context, and in the context of an "emotional and highly charged debate about an important public issue" over which the parties have "diametrically opposed views," the court reasoned that Offit's comment "she lies" "cannot reasonably be understood to suggest . . . that [plaintiff] is a person lacking honesty and

92

integrity . . . [who should be] shunned or excluded by those who seek information and opinion upon which to rely." Id. at *5. Indeed, Offit's comment is "plainly understood as an outpouring of exasperation and intellectual outrage over [p]laintiff's ability to gain traction for ideas that . . . Offit believes are seriously misguided, and not as a literal assertion of fact." Id. Lastly, the court noted that the plaintiff's claim of the statement's falsity "threatens to ensnare" the court in the "thorny and extremely contentious debate over the perceived risks of certain vaccines," their association with particular diseases, and, "at bottom, which side of this debate has 'truth' on their side." Id. at *6.

Finally, in Faltas v. State Newspaper, 928 F. Supp. 637, 649 (D.S.C. 1996) aff'd, 155 F.3d 557, 1998 WL 414238 (4th Cir. 1998), plaintiff Marie-Therese Faltas sued The State newspaper, several of its staff, and one individual who wrote a letter to the editor published by The State, for statements that she (1) "will lie to suit her agenda" and (2) "views her status as a physician as an opportunity to present lies as truth." Id. at 643–44. The defamation claim arose out of a controversy about what should be taught about homosexuality and gay rights generally. Id. at 645–46. Following an appearance on a live broadcast program during which she spoke on the topic of "homosexuals in the military," Faltas offered and subsequently wrote a newspaper op-ed in The State arguing that homosexuality was rarer than science suggested. Id. at 640. The State ultimately published four critical responses to Faltas' op-ed piece, only one of which (dated May 23, 1993) was the subject of the defamation action. Id. at 641. The author of the May 23 response, who was also a named defendant, first criticized the newspaper for initiating a "campaign of homophobia," and then made the following allegedly defamatory statement: "Marie Faltas in her op/ed piece

93

amazed us with her spurious and twisted logic. When she stated that gay men are likely to have taken estrogen, she offered no statistics to back up her claim and showed us how much she will lie to suit her agenda. The study that she espoused as the truth—the study that claims that only 1 percent of the population is gay—did not have a representative population or a scientifically correct questioning method . . . Faltas views her status as physician as an opportunity to present lies as truth." Id. Faltas alleged that the author and several of the newspaper defendants defamed her by printing the May 23 letter.

The court, after finding that Faltas qualified as a limited-purpose public figure because she voluntarily assumed a role of special prominence in a public controversy and "volatile debate," distinguished the facts before it from those in Milkovich. While both the May 23 response in Faltas and the article in Milkovich involved "statements that someone lied or is a liar," the Faltas court held that the "similarity ends there." Id. at 645, 647. In Milkovich, the Faltas court noted, the challenged statements had been written by a sports writer who stated in his regular column that Michael Milkovich, a local high school coach, had lied under oath, an indictable offense, during a hearing into the cause of a physical altercation at a wrestling match. Id. at 647–50. The column bore the heading, "[High School] beat the law with the 'big lie,'" and subheading, "[the author] says [High School] told a lie." Id. The column itself contained the following language which, in context, clearly referred to Milkovich: (1) "[the students learned a] lesson which, sadly, in view of the events of the past year, is well they learned early," (2)"[i]t is simply this: If you get in a jam, lie your way out," and (3) "[i]f you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really

94

happened." Id. Unlike the author of the May 23 letter, the Faltas court noted that the columnist in Milkovich (1) "described himself as perhaps the only disinterested person to observe the match," (2) "repeatedly and clearly stated that the plaintiff had lied under oath (the crime of perjury)," using the terms "lie" or "liar" nine or more times, and (3) indicated that the plaintiff "had lied, under oath, about what occurred on a given date at a given time – an 'objectively verifiable' event.'" Id. at 647–48.

The Faltas court noted that the May 23 letter was responding to Faltas' own op-ed piece, which was itself written on a "highly controversial topic" "as to which 'experts' obviously disagree, often in less than collegial tones." Id. In this context, the Faltas court concluded that "reasonable reader would presume the letter is an impassioned response to the positions taken by . . . Faltas in her article, and nothing more." Id. The court concluded that the allegedly defamatory statements in question, in context, translate to an accusation that plaintiff "baldly states conclusions without data" or, at worst, "manipulated or ignored statistics." Id. at 649. The court held that "[w]hen it comes to 'imaginative expression' and 'rhetorical hyperbole,' few terms have enjoyed so frequent an association in the common culture as the term[ ] 'lie' and 'statistic.'" Id. The author's statements in the May 23 response, written on a topic as to which "emotions and verbal exchanges often ran hot," were therefore found to "fall within the protection afforded for 'hyperbole.'" Id. Lastly, in support of finding the accusations of lying about issues concerning homosexuality non-actionable, the Faltas court noted that underlying scientific issues were not "easily susceptible (if at all) to 'proof' one way or the other." Id.

The facts before the court in this case, as well those pertaining to the challenged statements specifically at issue in paragraph 13(d), are of a feather with those in Schnare, Arthur, and Faltas. Here, as in Schnare, the parties have "positioned themselves on opposite sides of [a] controversy" related to the Flint water crisis, and the "ongoing tension [between the parties] figures prominently" throughout the Letter and would not go unnoticed by readers. 104 F. App'x at 848–49. The particular characteristics (e.g., responsive posture, derisive tenor, and loose language) immediately surrounding the challenged statements in paragraph 13(d) are closely analogous to those characteristics present in the aforementioned cases, alerting readers that the Letter generally is akin to an "opinionated and hyperbolic screed" within which the statements at issue are construable only as an "expressions of disagreement" or "expression[s] of contempt toward [an] adversary." Id. at 852–853.

What is more, determining the falsity of the claim that Flint residents caused or contributed to the shigella outbreak by altering their bathing habits, as in Arthur and Faltas, would mire the court in a scientific debate of the sort courts are loathe to resolve in defamation actions. Indeed, Edwards has explicitly stated his intent to lead the court, and trier of fact, into just such a morass about the causes of the shigella outbreak by introducing at trial a CDC presentation "explicitly stating that altered bathing habits contributed to Flint's shigella outbreak." ECF No. 21, at 24. See Underwager v. Salter, 22 F.3d 730, 736 (7th Cir. 1994) (holding that "[the plaintiffs] cannot, simply by filing suit and crying 'character assassination,' silence those who hold divergent views," and that "[s]cientific controversies must be settled by the methods of science rather than by methods of litigation").

96

Furthermore, several crucial dissimilarities the Faltas court identified between the facts before it and those in Milkovich apply with equal force in the present matter. First and foremost, there is no pretense of disinterestedness nor any semblance of non-partisanship on the part of the authors of the Letter. The authors and/or signatories do not claim to be "disinterested" or impartial observers, nor would a reasonable reader come away with that impression. It would be extremely apparent to even the most credulous reader that the parties are adversaries in a heated public controversy, and that any statement uttered in this context should be received with a heavy dose of skepticism or discounted altogether. Moreover, as in Faltas, the underlying issues in paragraph 13(d), what "Flint residents" in general were told about shigella and when and what caused the reported outbreak are unamenable to being proved true or false by a core of objective evidence or by reference to "what occurred on a given date at a given time – an 'objectively verifiable event.'" 928 F. Supp. at 648. In short, a reasonable reader would recognize that the authors are merely labelling positions with which they vehemently disagree as lies, and would recognize the use of the term "lie" in paragraph 13(d) as expressions of dissent rather than as assertions that Edwards made a specific claim knowing it to be false. See also Underwager v. Channel 9 Austl., 69 F.3d 361, 367 (9th Cir. 1995) (holding, in the context of a debate concerning a "highly controversial topic," that the term "lying" applies to a spectrum of untruths including "white lies," "partial truths," "misinterpretation," and "deception," and "[a]s a result, the statement is no more than nonactionable 'rhetorical hyperbole, a vigorous epithet used by those who considered [the appellant's] position extremely unreasonable'"); Horsley v. Rivera, 292 F.3d 695, 702 (11th Cir. 2002) ("The fact that the parties were engaged in an

97

emotional debate on a highly sensitive topic weighs in favor of the conclusion that a reasonable viewer would infer that [defendant's] statement was more an expression of outrage than an accusation of fact.")

### (5) Paragraph 13(e)

> What scares us is Mr. Edwards who **uses his position as a scientist to misrepresent us and silence us**.

Edwards contends that the above statement suggests that he lacks integrity and is unfit to perform his professional duties. He claims these alleged implications are factually false because he has never used his position as a scientist to misrepresent or silence Flint residents or anyone else. ECF No. 9, at 10.

The complained-of statement is plainly non-actionable both because it is a rhetorical statement employing loose, figurative language and because it is unverifiable. No reasonable reader would believe the authors use of the word "silence" to mean that Edwards was literally silencing the signatories. Nor would a reasonable reader interpret the use of the term "misrepresent" as implying an assertion of fact, rather than reflecting authors' subjective views. Indeed, it is clear that "[s]uch words were . . . used . . . in a loose, figurative sense" to demonstrate the signatories' disagreement with Edwards generally over a variety of matters. Indeed, considering the general tenor of the language immediately surrounding the challenged statement: "We (of course) bathe, which is why we have been saying that the problems with our water are not over . . . . "[W]e WANT science that addresses our questions, experiences and needs . . . [s]cience has [never] scared us . . . ," it is apparent that the authors were expressing frustration and indignation at claims by others regarding an

98

emotionally-charged and sensitive subject, namely the personal hygiene and bathing habits of Flint residents, and used hyperbolic, freewheeling, figurative speech to do so.

Further, paragraph 13(e) does not contain provably false content required to support a defamation claim. The court cannot imagine a circumscribed basis or core of objective evidence by which a jury could verify the challenged statement in paragraph 13(e) given the absence of any discernible, objective parameters in the statement itself. Indeed, any attempt to prove the falsity of the statement in paragraph 13(e) would engender an open-ended inquiry into the subjective judgments of the thirty-nine signatories of the Letter. See Gibson v. Boy Scouts of Am., 163 F. App'x 206, 212–13 (4th Cir. 2006) (holding that "absent discernable criteria against which to measure 'fitness,' the mere generalized statement that someone is unfit for a position in a volunteer association, standing alone, does not imply the existence of facts necessary to support a defamation claim"). Finally, for the same reasons that the statement is unverifiable, no reasonable reader would interpret paragraph 13(e) as implying that the authors possess knowledge of damaging, undisclosed facts of the sort necessary to support a defamation claim. See Ollman, 750 F.2d at 979 ("Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.").

### (6) Paragraph 13(f)

> In May 2016, Mr. Edwards erroneously accused Scott Smith and Water Defense of scaring residents out of bathing . . . Mr. Edwards also accused Dr. Laura Sullivan and Mr. McElmurry of FACHEP [Flint Area Community Health and Environment Partnership] of causing Flint residents to stop bathing because their research scared us (according to some reports, **Mr. Edwards made the preposterous claim that as many as 80% of us returned to a state of filth). This is insulting and false. It is also blatantly unscientific** because Mr.

99

Edwards did not bother to ask actual Flint residents about our bathing habits **before coming up with this pronouncement.**

Edwards asserts that statements in paragraph 13(f) impute that he lacks integrity and is unfit to perform professional duties. He further avers that said statements are "factually false," because, inter alia, (1) he "never made inflammatory and derogatory comments such as 'returned to a state of filth'" and/or "proclaimed that as many as 80 percent of Flint residents returned to a state of filth," nor (2) "made erroneous accusations regarding Scott Smith, Water Defense or FACHEP." ECF No. 9, at 10. Edwards claims to have referred to and cited CDC bathing statistics "regarding Flint bathing habits in keeping with his professional obligations." Id.

Insofar as Edwards claims to have never quoted or endorsed the 80 percent figure contained in paragraph 13(f), his own remarks at Swarthmore College, as memorialized in Exhibit 2, undermine that claim: "They were on the local media telling people that if they let their children bathe in this water they are hurting them and exposing them to carcinogens . . . [a]nd moms and dads started changing their children's bathing habits. Everyone, many people in Flint did this. CDC later studies [sic] showed 80% of Flint residents changed their bathing habits, including 75% showered less frequently, 70% were taking shorter showers." ECF No. 13–3, at 10–12.

With respect to the phrase "state of filth," this particular aspect of the challenged statement falls within the category of "lusty and imaginative expression of contempt" or colorful characterization, to wit, protected rhetorical hyperbole. Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin, 418 U.S. 264, 285–86 (1974). No reasonable reader would conclude that Edwards uttered this objectionable phrase or that it

100

was otherwise a faithful recitation of comments and positions taken by Edwards vis-à-vis issue of Flint residents' bathing habits. Though Edwards quarrels with the negative implications of this, and other characterizations throughout the Letter, such implications do not transform what is plainly an expression of opinion into a statement of fact.

Lastly, Edwards claims he never "made erroneous accusations regarding Scott Smith, Water Defense or FACHEP," as he always "referred to and cited . . . CDC statistics regarding Flint bathing habits in keeping with his professional obligations." ECF No. 9, at 10. This ambiguous averment admits of two possible interpretations: (1) Edwards is claiming to have never accused Scott Smith, Water Defense, or the FACHEP of scaring Flint residents out of bathing in the first place, or, (2) although Edwards did accuse the aforementioned parties of scaring Flint residents, it was not incorrect ("erroneous") of him to do so. The court assumes that Edwards' intended the latter interpretation, as it appears to comport more with the plain language of his claim to have always "referred to and cited . . . CDC statistics regarding Flint bathing habits." ECF No. 9, at 10.[31] Whether Edwards erroneously accused Scott Smith, Water Defense, or the FACHEP of scaring Flint residents out of bathing is a matter of opinion and, in any event, too vague a claim to support an action for defamation or the implication that Edwards lacks integrity or is unfit to perform his professional duties.

### (7) Paragraph 13(g)

> To our knowledge, **there is no one in the scientific community overseeing Mr. Edwards' work or the way he uses his power over powerless residents.** As far as we know **there is no one in the**

---

[31] The court would note that it experienced significant difficulty parsing this and other averments and addressing what appear to be numerous, perhaps unintentional, equivocations throughout Edwards' pleadings.

**scientific community ensuring the integrity and honesty of Mr.
Edwards' words, research and activism.** Mr. Edwards has
repeatedly **spoken and written about how there are no bacteria or
dangerous pathogens in Flint residents' water,** even though he is
not a microbiologist nor is he doing mass testing within our homes.

Edwards complains that statements in paragraph 13(g)(1) "impute that [he] lacks

integrity and is unfit to perform his professional duties," (2) insinuate that he is "not subject

to the same peer review and academic oversight to which all members of his profession are

subject," and (2) suggest that he "abuses 'power' to purposefully harm people" and lacks

"'integrity and honesty' in his professional activities." ECF No. 9, at 10–11. Edwards

counters that he is in fact subject to the same review and oversight as other similarly situated

professors and scientists, does not abuse power to harm people, and conducts himself with

integrity and honesty. Id. Lastly, Edwards asserts that the allegations that he has "repeatedly

spoken and written about how there are no bacteria or dangerous pathogens in Flint

residents' water" "intentionally misrepresent and distort [his] actual comments regarding

bathing and are therefore false." Id.

The language employed in the first two challenged statements in paragraph 13(g)

make it clear that those statements represent "subjective and speculative supposition" of the

sort the Fourth Circuit noted was unlikely to assert actionable facts. Biospherics, 151 F.3d at

184. The only reasonable interpretation of these statements is as follows: from the

perspective of the authors and/or signatories, and based on tenuous, speculative premises

set forth in the Letter, it appears as if there is no oversight of Edwards' work or anybody

"ensuring the integrity and honesty of [his] words, research, and activism." ECF No. 9, at 3.

The authors' speculations clearly rest on their idiosyncratic impressions, rather than

102

undisclosed, objectively verifiable facts. See Snyder, 580 F.3d at 219 (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993) ("[I]f it is plain that the speaker is expressing a . . . conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.")). In light of the cautionary language, "[t]o our knowledge" and "[a]s far as we know," qualifying these statements upfront, and indicia of partisanship which would "fall on [readers'] ears like repetitive drumbeats," Chaves, 230 Va. at 116–19, 335 S.E.2d at 100–01, these statements simply cannot be construed as asserting facts. See Milkovich, 497 U.S. at 32 (1990) (J., Brennan, dissenting) (observing that (1) "cautionary language . . . of this type put[s] the reader on notice that what is being read is opinion and thus weaken[s] any inference that the author possesses knowledge of damaging, undisclosed facts," (2) "when the reasonable reader encounters cautionary language, he tends to 'discount that which follows,'" and (3) "certain formats . . . signal the reader to anticipate a departure from what is actually known by the author as fact" (citations omitted)).[32]

Lastly, Edwards takes issue with the final statement in paragraph 13(g), claiming that the authors "intentionally misrepresent and distort [his] actual comments regarding bathing," and "impugn [him] professionally" by suggesting that he has breached the norms and scope

---

[32] This is not to say that hedged phrasing or the use of cautionary language expressing uncertainty or qualification automatically insulates a statement most reasonably understood as stating actual facts from being actionable. See Milkovich, 497 U.S. at 18–19 (phrases like "in my opinion" and "I think" do not necessarily dispel defamatory implications). However, where, as here, the contextual factors posited in Ollman would predispose a reasonable reader to question or discount the veracity of a given statement and treat it as speculative supposition, such a statement cannot be reasonably understood as conveying facts. See Gibson, 163 F. App'x at 213 (holding that defendant's suggestion that plaintiff was not being candid with his own counsel concerning the reasons for his membership revocation involved "nothing more than subjective opinion" because the defendant had no basis of knowledge as to what the plaintiff told his attorney, and therefore "the statement [was] one of opinion based on the [defendant's] experiences and expresses speculation rather than fact").

103

of his training, "makes erroneous and irresponsible statements, as well as sweeping generalizations inappropriate for a scientist during the course of his work," and is unfit to be a professor. ECF No. 9, at 10. Here, again, it is theoretically possible to verify whether Edwards has "repeatedly spoken and written about how there are no bacteria or dangerous pathogens in Flint residents' water." See Tharpe, 285 Va. at 480, 737 S.E.2d at 892 (holding that the critical defamatory statement was not embedded in the content of the quotation attributed to the plaintiff, but rather in the objectively verifiable fact that the statement was never made). It may also be the case that making such a "sweeping generalization" is, as Edwards claims, in some contexts "inappropriate" or "irresponsible" for a scientist. Nevertheless, no reasonable reader would conclude, given the "sweeping," categorical nature of the attributed statement, that it represents anything other than the authors' tendentious paraphrasing or subjective, oversimplified rendering of a statement that may or may not have been made by Edwards. In other words, a reasonable reader of the Letter or observer of this controversy is unlikely to construe any allegedly attributed statement or claim literally, or as a reliable indicator of what Edwards actually said or meant.

Yet, even if the court assumes otherwise, the allegedly false attribution at issue and those implications averred by Edwards, lack the requisite "sting" for actionable defamation under Virginia law. While there is no uniform standard in Virginia for assessing actionable "sting," especially where false attribution is at issue, several cases suggest the degree of injury to a person's reputation required to state a claim for defamation and defamation per se. In Echtenkamp v. Loudon Cty. Pub. Sch., 263 F. Supp. 2d 1043, 1063–64 (E.D. Va. 2003), for example, the court found that the following statements by the defendant about Echtenkamp

104

in the employment context were neither defamatory per se, nor bearing sufficient "sting" under a general defamation standard: (1) Echtenkamp behaved inappropriately during a student-counseling group by "insulting" and "contradicting" the defendant; (2) Echtenkamp was inept at handling a situation involving two disabled students; (3) Echtenkamp must continue to become more accepting of others' opinions and that many colleagues perceive her as "manipulative and defensive," and (4) Echtenkamp needs to develop greater sensitivity to the reactions of others and to monitor her behavior. The Echtenkamp court found that these statements were not defamatory because "they cannot be construed to imply that [Echtenkamp] is unfit for or lacks integrity in performing her duties or to prejudice the plaintiff in her profession, nor are they severe enough to make plaintiff appear odious, infamous, or ridiculous." Id. at 1063.

Here, of course, Edwards claims that the statement at issue was falsely attributed to him rather than made about him to a third party. The holding in Echtenkamp, however, suggests that regardless of whether the statement was made by or about Edwards, substantially greater sting is necessary to state a claim than that which Edwards asserts the allegedly false attribution at issue in paragraph 13(g) is imbued with. In other words, that Edwards may have made a single "inappropriate" or "irresponsible" comment, especially a comment as facially unremarkable as the one at issue, is not sufficiently prejudicial to Edwards' professional reputation to constitute defamation per se or defamation. Cf. Sepmoree v. Bio-Med. Applications of Virginia, Inc., No. 2:14CV141, 2014 WL 4444435, at *6 (E.D. Va. Sept. 8, 2014) (attributing to plaintiff, a registered nurse, various statements

105

evincing significant callousness towards patients and implying that several patients should be harmed or murdered); Tharpe, 285 Va. at 476, 737 S.E.2d at 894–95.

### (8) Paragraph 13(h)

> Instead, **Mr. Edwards goes around the country giving talks that dismiss our concerns and calls us 'tribal'** . . . . Shockingly, **Mr. Edwards has gone as far as to declare that the Flint Water Crisis was over 2 years ago** (in 2016) . . . . We need an end to his disruptive presence so that we can finally clean up the mess he has left behind him, focus on healing the rifts he has created between residents, and try to address the real problems plaguing us.

With respect to paragraph 13(h), Edwards contends that he (1) never called Flint residents "tribal." ECF No. 9, at 11. Viewed "[i]n the context of the entire Letter and the circumstances of the Letter's publication," Edwards asserts that attributing the use of this term to him (2) "intentionally and falsely implies, and would be understood by an objective reader to imply" that he is "racist, bigoted, and/or prejudiced against minorities and/or poor individuals." Id. Edwards contends that not only does the word "tribal" never appear in the presentation transcript (Exhibit 2), but that the defendants knew he "never used that specific word or referred to tribalism in the inflammatory sense attributed to him." ECF No. 9, at 27. Edwards explains that he merely used the phrase "age of tribalism" in public comments to refer to "political parties and institutions," but never with racist or prejudicial connotations. Id. The defendants concede that, "[t]echnically . . . [Edwards] did not use the word 'tribal' but instead claimed during his lectures on 'tribalism' that residents of the majority-minority city of Flint caused their own dysentery due to their bathing habits." ECF No. 13, at 4–5. They claim that this "scientifically inaccurate depiction of Flint residents beckons colonial messaging about indigenous populations." Id. Edwards also complains that the Letter falsely

106

accuses him of causing "rifts" between residents and falsely suggests that his conduct

harmed Flint residents, that he lacks integrity, and is unfit to perform his professional duties.

Id. at 11. He claims that all of these statements and their purported insinuations are false. Id.

The statement accusing Edwards of causing "rifts" employs precisely the sort of

"loosely definable" or "variously interpretable" term that cannot reasonable be interpreted as

a statement of fact. Ollman, 750 F.2d at 980 (quoting Buckley v. Littell, 539 F.2d 882, 895

(2d Cir. 1976), cert. denied, 429 U.S. 1062 (1977). The term "rift," as defined by Webster's

New Universal Unabridged Dictionary, means, "a difference in opinion, belief, or interest

that causes such a break in friendly relations." Webster's New Universal Unabridged

Dictionary 1656 (2nd ed. 2003). It goes almost without saying that "rift" is the sort of term

"whose content is so debatable, loose and varying, that [it] is insusceptible to proof of truth

or falsity," and therefore the truth of the accusation at issue "may be debated, but cannot be

denied." Carto, 649 F. Supp. at 507–09 (citation omitted). Indeed, the involvement of the

court or a trier of fact in ascertaining the meaning of this vague charge, of causing "rifts,"

would undoubtedly "transport it into 'the area of opinion as opposed to factual assertion.'"

Id. (collecting cases); see Levinsky's Inc., 127 F.3d at 129 ("The vaguer a term, or the more

meanings it reasonably can convey, the less likely it is to be actionable."). For the same

reason that this charge is too imprecise to be reasonably understood as stating or implying

facts, it is also not amenable to verification, as there is simply no way to discern where the

evidence would begin or end or how a jury could determine its truth objectively.

The only remaining allegedly defamatory statement at issue in this case states that

"Mr. Edwards . . . calls us 'tribal.'" Edwards asserts that the accusation that he called Flint

residents "tribal" would be understood by a reasonable reader as implying that he is "racist, bigoted, and/or prejudiced." ECF No. 9, at 11. In light of the defendants' admission that Edwards never "technically" uttered the word "tribal," enclosing "tribal" in quotation marks makes this statement qualitatively different and potentially more misleading than the rest of the allegedly defamatory statements in the Letter. Typically, the use of such punctuation signifies verbatim speech. Indeed, quotation marks are "used chiefly to indicate the beginning and the end of a quotation in which the exact phraseology of another or of a text is directly cited," and, under most circumstances, a reader would expect quotations marks denote a faithful representation of language used by another. Merriam-Webster's New Collegiate Dictionary 942 (1981). In the present case, however, a reasonable, circumspect reader of the Letter, (1) cognizant of the broader and immediate context in which this statement was made, (2) buffeted by roughly twelve paragraphs of emotionally-charged commentary and criticisms of Edwards, and, crucially, (3) mindful of the way in which quotations marks were consistently used throughout the Letter, would not interpret the challenged statement as a direct quotation, but rather as yet another subjective characterization. See Phoenix Trading, Inc. v. Loops LLC, 732 F.3d 936, 945 (9th Cir. 2013) (endorsing the Washington Supreme Court's position that "[i]n the context of ongoing public debates, the audience is prepared for mischaracterizations and exaggerations, and is likely to view such representations with an awareness of the subjective biases of the speaker"); CACI, 536 F.3d at 304 ("This case reminds us that '[i]t is a prized . . . privilege to speak one's mind, although not always with perfect good taste, on all public [issues], and this

opportunity is to be afforded for vigorous advocacy' that may be caustic and even exaggerated." (citations omitted)).

The controlling authority concerning the defamatory impact and falsity of misquoted material is Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 500 (1991). Masson involved a two-part article published by Janet Malcolm in The New Yorker Magazine about a noted psychoanalyst, Jeffrey Masson, concerning the termination of his employment. 501 U.S. at 499–500. The article was largely based on Malcolm's tape-recorded interviews with Masson. Masson sued The New Yorker Magazine, among others, for defamation based on fabricated words attributed to him and misleadingly edited statements. Id. at 500–01. The article included lengthy quotations ostensibly from Masson that presented him in an unflattering light or, according to one reviewer, as a "grandiose egoist – mean-spirited, self-serving, full of braggadocio, impossibly arrogant and, in the end, a self-destructive fool." Id. at 501. Masson's principal complaint was that Malcolm, "with full knowledge of the inaccuracy, used quotation marks to attribute to him comments he had not made." Id. at 499. There was no question that Malcolm had in multiple instances materially altered and changed the meaning of Masson's words. For example, the Malcolm quoted Masson as saying that his superiors regarded him as an "intellectual gigolo." Id. at 502. In fact, Masson simply said that they thought he was a "private asset but a public liability" and that he was much "too junior within the hierarchy of analysis[ ] for these important training analysts to be caught dead with [him]." Id. at 503. Malcolm also quoted Masson as saying that his colleagues "will say that Masson is a great scholar, a major analyst—after Freud, . . . the

109

greatest analyst who ever lived." Id. at 506. No such statement appeared in the more than 40 hours of taped interviews.

In concluding that a jury could find these published passages, among others, to be false, the Supreme Court commented upon the nature of quotations as appearing more authoritative and credible than descriptive passages. Id. at 511–13. It explained that when an author chooses to use quotation marks, typically that choice signals to the reader that the author is attempting to represent what the speaker actually said, rather than paraphrasing or conveying the statement through an interpretive lens. Id. at 511. The Court observed that "[q]uotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject." Id. at 511. However, the Court also underscored that, "of course, quotations do not always convey that the speaker actually said or wrote the quoted material . . . [p]unctuation marks, like words, have many uses. Writers often use quotation marks, yet no reasonable reader would assume that such punctuation automatically implies the truth of the quoted material." Id. at 512. With respect to The New Yorker Magazine article in Masson, the Court noted:

> The work at issue here . . . , as with much journalistic writing, provides the reader with no clue that the quotations are being used as a rhetorical device or to paraphrase the speaker's actual statements. To the contrary, the work purports to be nonfiction, the result of numerous interviews . . . [a]t least a trier of fact could so conclude. The work contains lengthy quotations attributed to petitioner, and neither Malcolm nor her publishers indicate to the reader that the quotations are anything but the reproduction of actual conversations. Further, the work was published in The New Yorker, a magazine which at the relevant time seemed to enjoy a reputation for scrupulous factual

110

> accuracy. These factors would, or at least could, lead a reader to
> take the quotations at face value.

Masson, 501 U.S. at 513. In sum, the court concluded that "a trier of fact in this case could find that the reasonable reader would understand the quotations to be nearly verbatim reports of statements made by the subject." Id.

The facts before this court are distinguishable in almost every respect from those in Masson, and those dissimilarities are such that a reasonable reader of the Letter would interpret the use of quotation marks around the word "tribal" quite differently from a reader of the lengthy quotations contained in The New Yorker Magazine article in Masson. Unlike in Masson, the Letter is manifestly not a piece of journalistic writing, and no reasonable reader would credit any of its contents as such. Nor would a reasonable reader expect scrupulous factual accuracy from a document purporting to represent the views of dozens of individuals sent from a generic, semi-anonymous email address (flintcomplaint@gmail.com) unconnected to a single speaker. Moreover, the Letter is at no point framed in a way which might lull a reasonable reader into taking any of part of the statements contained therein at face value.

To the contrary, the exasperated tenor, advocative style, and responsive posture would invariably lead a reasonable person to expect something less than scrupulous factual accuracy. The sentence immediately preceding the statement at issue, for example, reads: "Ultimately, Mr. Edwards' focus, and the focus of any specialist claiming 'save' us, should be on our LIVES, our first-hand EXPERIENCES, our NEEDS, and on the fact that we are still suffering." ECF No. 9–1, at 3. Later in the same paragraph of the Letter, the authors state: "We believe it would be best that Mr. Edwards now leaves our town alone . . . . Mr.

111

Edwards' choice to initiate drama distracts from the real suffering in Flint and needs to stop NOW." Id. In short, the sentences surrounding the challenged statement are among the more rhetorically saturated and emotionally charged in the whole of the Letter, with a predominate tone of urgency, exasperation, and resentment.

Most importantly, throughout the Letter, quotation marks are used rhetorically in a manner that cannot rationally be interpreted as verbatim representations of words Edwards actually uttered. Unlike in Masson, where Malcolm provided no reason for a reasonable reader to conclude that the quoted attributions to Masson were anything but verbatim, the consistent (and nearly exclusive) use of quotation marks in the Letter as a rhetorical device make it unreasonable for a reader to construe the use of this punctuation around the word "tribal" as a direct quotation faithful to Edwards' words. The following are salient examples of the rhetorical use of quotation marks in the Letter:

> (1) Michigan residents never asked Mr. Edwards to file this complaint on our behalf, nor do we as a "group" support it, so the complaint should be titled "Marc Edwards vs. Whomever He Chooses . . ."

> (2) Mr. Edwards' claims that he represents "the people of Flint" or works "with Flint residents" are hollow.

> (3) Mr. Edwards fighting his own petty and vicious fights . . . , all under the guise of "protecting" and "saving" us, or "defending" science.

> (4) Far too many residents in Flint are exhausted from Mr. Edwards's bullying, his claims to be the "humanitarian" who so "cares" for the people, and his Hollywood antics – this is not Entertainment Tonight.

Nowhere in his pleadings does Edwards allege that the use of quotation marks in any of the above statements would be understood as direct quotations. Nor could Edwards advance

112

such an argument. The authors are obviously employing quotations marks around single words, such as "save," "humanitarian," or "cares," or short phrases, such as "the people of Flint," to express sarcasm, skepticism, and contempt, or to draw attention to propositions with which the authors disagree or wish to distance themselves. This peculiar use of quotations marks, colloquially referred to as "sneer" or "scare" quotes, throughout the Letter would substantially negate any impression that the complained-of statement represents a direct quotation or straightforward reproduction of Edwards' remarks. Edwards' failure to specifically allege false attribution as to any of the above statements appears to be a tacit acknowledgment of this point. In sum, unlike the article that was the subject of the defamation suit in <u>Masson</u>, the Letter provides numerous clues that quotation marks are being used rhetorically, such that a reasonable reader would not assume the marks imply that Edwards himself used the word "tribal."[33]

## V.

In sum, none of the statements alleged by Edwards to be defamatory are of such a character sufficient to support a defamation action. Therefore, the defendants' motion to dismiss for failure to state a claim, insofar as it seeks dismissal of Edwards' claims for defamation per se (Count I) and defamation (Count II) arising from the Letter, is granted.

Edwards' remaining claims for tortious interference with contract expectancy, business relationship, and economic advantage (Count III), common law civil conspiracy

---

[33] The court would also note that the inclusion of a hyperlink directly following the word "tribal" to the transcript of Edwards' remarks not only enables readers to assess the validity of this characterization for themselves, but alleviates whatever defamatory potential existed in the first place. <u>See</u> <u>Nicosia v. De Rooy</u>, 72 F. Supp. 2d 1093, 1105 (N.D. Cal. 1999) (hyperlinks to underlying source material may provide the attribution necessary for a statement to be considered an opinion based on disclosed facts).

113

(Count IV), and statutory civil conspiracy pursuant to Va. Code Ann. § 18.2-499 et seq. (Count V) are inextricably tied to his underlying defamation claims.[34] See Skillstorm, Inc. v. Elec. Data Sys., LLC, 666 F. Supp. 2d 610, 616 (E.D. Va. 2009) (dismissing tortious interference claim where court could not "plausibly infer" defamation); Livia Properties, LLC v. Jones Lang LaSalle Americas, Inc., No. CIV.A. 5:14-00053, 2015 WL 4711585, at *9–10 (W.D. Va. Aug. 7, 2015), aff'd sub nom. Livia Properties, II, LLC v. Jones Lang LaSalle Americas, Inc., 646 F. App'x 322 (4th Cir. 2016) (collecting cases showing that without an underlying tort, there is no conspiracy to commit the tort). Having found that Edwards failed to state a claim under Count I and Count II, the remaining claims (Counts III-V) necessarily fail and are therefore dismissed.

## VI.

For the foregoing reasons, the court will **GRANT in part** and **DENY in part** the defendants' motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. The defamation claims alleged in paragraphs 52, 53, 54, 55, 56, and 63 of the Amended Complaint are **DISMISSED without prejudice**. The defamation claims arising from the Letter are **DISMISSED** pursuant to Rule 12(b)(2) as to Schwartz and Lambrinidou. The motion to dismiss for want of personal jurisdiction is **DENIED** as to Mays only for defamation claims arising from the Letter.

The court will **GRANT** the motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) for all of the allegedly defamatory statements

---

[34] Edwards "agrees" and/or "concedes" that Counts III-V depend on the viability of his defamation claims in Count I and Count II. ECF No. 21, at 27–28.

114

contained in the Letter. These claims are **DISMISSED with prejudice**. The court will **GRANT** this same motion to dismiss as to Count III, Count IV, and Count V. Insofar as Counts III–V are predicated upon the Letter, they are **DISMISSED with prejudice**. Lastly, the defendants' motion for attorney's fees is **DENIED**.

An appropriate Order will be entered this day.

Entered: 03—19—2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge

115